Commonwealth *v.* Taylor, Appellant.

Argued April 23, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*H. Robert Fiebach,* with him *Bernard L. Segal,* for appellant.

*Maxine J. Stotland,* Assistant District Attorney, with her *Milton M. Stein,* Assistant District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE EAGEN, September 19, 1973:

Walter Taylor was convicted by a jury of murder in the first degree and the punishment was fixed at life imprisonment. He was also convicted of aggravated robbery. After the denial of post-trial motions, sentence was imposed on the murder conviction as the jury directed. Sentence was suspended on the robbery conviction. This appeal was then filed. After reviewing the record, we conclude a new trial is necessary because of prejudicial error in the trial judge's instructions to the jury.

The prosecution followed the untimely death of Miss Marjorie Callaghan, a supervisor in the cafeteria of the Reliance Insurance Company, 4 Penn Center, Philadelphia. Miss Callaghan's dead body was found on the morning of July 10, 1968, under a pile of boxes in a

walk-in refrigerator of the cafeteria. An on-the-site examination followed by an autopsy by the medical examiner of the City of Philadelphia established she had been dead for several hours and death was due to multiple stab wounds and manual strangulation.[1] On July 14th, after being warned of his constitutional rights, as mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), Taylor, thirty-six years of age, gave an inculpatory statement to the police detailing the circumstances of Miss Callaghan's death, which was simultaneously recorded on a typewriter and a tape recording machine. In this statement, Taylor admitted stabbing and robbing Miss Callaghan on the late afternoon of July 9th and then hiding her body in the cafeteria's refrigerator. A pretrial motion to suppress the evidence of this statement was denied after an extended evidentiary hearing and this evidence was admitted at trial over objection.

At trial, no attempt was made to deny Taylor committed the crimes or that he made the statement to the police; however, through the testimony of two medical witnesses the defense attempted to convince the jury: (1) Taylor's statement to the police was involuntary; and (2) Taylor was not criminally responsible because of mental and personality deficiencies.

The first such witness, Dr. Robert L. Sadoff, a psychiatrist with experience in forensic psychiatry, testified in material part that he examined Taylor personally in March and April of 1969; that he studied the contents of: (a) Taylor's statement to the police, (b) summaries prepared in 1948 at the Pennsylvania Institute for Defective Delinquents in Huntingdon, Pennsylvania, where Taylor was then institutionalized, (c) the

---

[1] There were twelve stab wounds in the body, some of which were sufficient to cause death according to the examiner. However, he also stated the strangulation could have been the direct cause of the death.

results of a neurological examination and electroencephalogram test given Taylor in 1969, and (d) the report of Dr. Sheila Scott who administered a series of psychological tests to Taylor in 1969; that on the basis of the information thus gained he concluded that in July 1968, Taylor was a "borderline defective" and suffering from hallucinatory experiences and a schizophrenic reaction, paranoid type.

In reference to Taylor's statement to the police, Dr. Sadoff expressed the opinion that "from a totally emotional point," because of the nature of his personality disorder, his psychosis and the attending external and internal stress, Taylor "was not capable of fully understanding the significance" of the warnings of constitutional rights read to him by the police before he inculpated himself and that Taylor was "overwhelmed" by the circumstances including the police questioning and "gave in" to the questioning to alleviate his fear of being personally harmed.[2]

In reference to Taylor's mentality at the time of the killing, Dr. Sadoff expressed the opinion Taylor knew the difference between right and wrong and that what he was doing was wrong, but he was not able to adhere "to the right way but was impelled or compelled . . . to commit the wrong . . . ."

Dr. Sadoff also stated he did not personally administer intelligence and apperception tests to Taylor, but Dr. Scott administered such tests and, relying on her report of the results, he concluded Taylor had a full-scale I.Q. of 79, a performance I.Q. of 92 and a verbal I.Q. of 71. He also said this full-scale I.Q. score would place Taylor "in the lower three per cent of the population" but the performance I.Q. score would place him in the "lower 40%" of the population.

---

[2] There is no evidence in the record which would indicate that Taylor was harmed, or threatened with harm by the police.

The next medical witness called by the defense was a clinical psychologist, Dr. Sheila Scott. She testified, in part, to administering a battery of psychological tests to Taylor on several dates between March 7 and July 17, 1969, and that the results of these tests manifested a disturbed personality of schizoid quality which "when extremely frustrated may react over emotionally, get very disruptive and become delusional." She also stated Taylor's full-scale I.Q. score of 79 indicated "he functions less efficiently than 92% of the population" and "his intellectual level verbally" indicates "when it came to words and meaning of words he functions less than 97% of the people." Dr. Scott expressed the opinion that Taylor could comprehend only about 20% of the words in the warnings of constitutional rights read to him by the police in the time period these warnings were given.

On cross-examination, the district attorney stated according to his recollection, Dr. Sadoff testified that in the performance area Taylor functioned at 40% of the population and asked if Dr. Scott would disagree with Dr. Sadoff. The witness responded by saying, "Well, I would. I want to check the manual, but it is 30%, I'm quite sure." The witness then went on to explain that Taylor's performance I.Q. score and his verbal I.Q. score had implications separate and distinct and when she mentioned the figure 97% she was referring to his verbal functioning.

In answer to another question on redirect examination as to the variance between her testimony and that of Dr. Sadoff as to what percentile of the population Taylor's performance I.Q. score would place him in, Dr. Scott said she had "checked the manual" and Taylor was in the 30th percentile.[3]

---

[3] During the cross-examination, Dr. Scott was also asked by the district attorney if in her opinion Taylor knew the difference between right and wrong on July 9, 1968. She first answered "yes"

The trial judge gave a very thorough charge to the jury and discussed the testimony of Dr. Sadoff and Dr.

to this question, but then qualified her answer by saying, "I think he half-way comprehended but did not realize the consequences." On redirect examination, which occurred the following Monday after the weekend recess, Dr. Scott said that after reconsidering the district attorney's question there was a doubt in her mind whether Taylor really knew the difference between right and wrong when he inflicted the first stab wound on Miss Callaghan, but there was no doubt in her mind that he did not know this difference after the first stab wound was inflicted. Hence, it is clear the testimony of Dr. Scott was of the utmost importance to Taylor in proving the defense of insanity.

In charging the jury on this portion of the testimony the trial judge stated:

"Now, Dr. Scott stated, and listen to this carefully because in my opinion it is very important, that in her opinion on July the 9th, 1969, that Walter Taylor knew the nature and quality of his act and two, that he knew the difference between right and wrong.

"Then she stated further that while he could comprehend his act, he didn't know the consequences.

"Then you will recall that it was late on Friday, and we adjourned until Monday morning, Dr. Scott came in on Monday morning and took the witness stand again. Now, I think that she changed her testimony. You may not think so. It is for you to determine. But my recollection is that she clearly made the statements which I have in the notes.

"Now, as I told you before, my notes may be wrong. That's my recollection. Yours may be different. If you disagree with my recollection disregard mine and accept yours.

"Now, what does she say when she came in on Monday after she had a weekend to consider this?

"She said on Friday, she had said that the Defendant definitely knew the difference between right and wrong. And then she changed that testimony and said that she had doubt that he knew right from wrong, but even if he did, he could not help himself.

. . . .

"She conceded that on Friday she said that in her opinion the Defendant understood the nature and quality of his act but she changed this to say she believed he did intend to hurt Miss Callaghan, but after he stabbed her the first time he went into the frenzy and did not know what he was doing."

Scott minutely. It was in discussing Dr. Scott's testimony that the court inadvertently fell into error.

Initially, the trial judge told the jury that Dr. Scott testified he [Taylor] functions less than 92% of his age group. That intellectually he functioned less than 97% of his age group. He stated: "I want you to remember that because she said that he functions less than 92 per cent of his age group which means that would put him in the bottom eight per cent of his scale group. Now, this is the testimony of this trained psychologist." Shortly thereafter, the trial judge said this **to the jury**:

"Now, when it was pointed out to Dr. Scott that she had said that her tests indicated that the Defendant could function less than 92 per cent of his age group or eight per cent, and Dr. Sadoff had testified that he could function as well as 40 per cent of his age group, she admitted her previous testimony was wrong and conceded that he could function as well as 30 per cent of his age group.

"Now, in my opinion, you may not agree with this, but in my opinion that is a very important item to judge Dr. Scott's reliability.

"She testified that he was in the lower eight per cent. Dr. Sadoff testified that he's in the lower 40 per cent, and then when she—it is pointed out to her, she changes her testimony and says it's in 30 per cent. Why would she say, put him in a lower—here's a trained psychologist—why would she make a mistake of that kind? It's for you to determine. I make no comment about it. Now, this [is] of the utmost importance, also, in my opinion; it may not be in yours."

A close study of the record establishes the court was in error in stating Dr. Scott "admitted her previous testimony was wrong and conceded that he [Taylor] could function as well as 30% of his age group." This never occurred. Additionally, the court was in error

in stating Dr. Scott had changed her testimony as to the percentile of the population Taylor's I.Q. would place him in. Dr. Scott's testimony never varied as to Taylor's I.Q. scores or their impact. Apparently, the court was confused as to Dr. Scott's testimony in reference to Taylor's I.Q. performance score and her testimony as to his verbal I.Q. score.

At the conclusion of the charge, defense counsel called the court's attention to its misstatements in reference to Dr. Scott's testimony, but the court refused to correct the charge. A specific exception was then entered.

The Commonwealth argues the error was harmless in view of the court's admonition to the jury that it was the jury's recollection of the testimony that controlled. It also urges the error was in reference to testimony concerning whether or not Taylor intelligently understood his rights before talking to the police, and this question was not for the trial jury.

The above contentions, as asserted by the Commonwealth, are deficient in that they overlook the impact of the erroneous charge as it affects the reliability and credibility of Dr. Scott as a witness. Her testimony was of the utmost importance to the jury in assessing the defense's claim of legal insanity, for without her testimony there was no evidence to show Taylor was legally insane at the time of the killing. Thus, although the immediate impact of the charge was to discredit Dr. Scott with respect to her testimony on Taylor's intelligence and his ability to voluntarily waive his constitutional rights, the charge, as given, unavoidably would have influenced the jury in assessing her credibility and reliability on the issue of insanity. To err in a recitation of the facts by the trial judge is one thing, and under certain circumstances can be corrected by appropriate instructions. But, to compound the error by destroying the reliability of a witness through

misstating his or her testimony is something again, and under the instant circumstances constitutes reversible error. Cf. *Commonwealth v. Crawford*, 452 Pa. 326, 305 A. 2d 893 (1973); *Commercial v. Zeger*, 200 Pa. Superior Ct. 92, 186 A. 2d 922 (1962); and *Commonwealth v. Johnson*, 153 Pa. Superior Ct. 437, 34 A. 2d 170 (1943).

Reversed and a new trial is ordered.