Commonwealth *v.* Hill et al., Appellants.

544

Argued June 14, 1974. Before Watkins, P. J., Jacobs, Hoffman, Cercone, Price, Van der Voort, and Spaeth, JJ.

*Calvin S. Drayer, Jr.,* Assistant Public Defender, with him *Arthur J. King* and *Paul A. Prince,* Assistant Public Defenders, for appellants.

*Stewart J. Greenleaf,* Assistant District Attorney, with him *J. David Bean,* Assistant District Attorney, *William T. Nicholas,* First Assistant District Attorney, and *Milton O. Moss,* District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., December 1, 1975:

Appellants, who were co-defendants, were convicted by a jury of charges arising out of a robbery committed on December 11, 1972, in Dominic Molettiere's grocery store, Molettiere's Market in Lansdale. Specifically, they were convicted of burglary (Indictment No. 3951), robbery with accomplice and by force (Indictment No. 3952), assault and battery and aggravated assault and battery (Indictment No. 3953), and conspiracy (Indictment No. 3954). Each appellant was sentenced to 10 to 20 years on No. 3951, 10 to 20 years on No. 3952, 1 to 2 years on assault and battery, and 1½ to 3 years on aggravated assault and battery, on No. 3953, and 1 to 2 years on No. 3954, these sentences to run consecutively. The total sentence for each appellant was therefore 23½ to 47

years. Appellants have raised eleven issues on appeal.[1]

The first issue is whether the trial judge erred in refusing to hear appellant Burgess's oral motion to suppress a statement allegedly obtained in violation of his right to the advice of counsel. In denying the motion, the judge cited Pa. R. Crim. P. 323(b), which provides that "[u]nless the opportunity did not previously exist, or the interests of justice otherwise require," a motion to suppress shall be made "not later than ten days before the beginning of the trial session in which the case is listed for trial . . . ." However, whether the judge's application of this rule was proper need not be decided, for the statement complained of was never introduced in evidence. Any error in denying the motion to suppress was thus harmless. *Commonwealth v. Blose,* 160 Pa. Superior Ct. 165, 50 A.2d 742 (1947).

The second and seventh issues concern the validity of appellants' arrest and subsequent search, one hour after the robbery, in Mattero's Junk Yard, a few blocks from Molettiere's Market.

"It is well established that a police officer is authorized to arrest without a warrant where he has probable cause to believe that a felony has been committed and that the person to be arrested is the felon . . . 'Probable cause' is said to exist where facts and circumstances within the knowledge of the arresting officer are reasonably trustworthy and sufficient in themselves to warrant a man of reasonable caution to believe that the person to be arrested has committed the offense." *Commonwealth v. Jackson,* 450 Pa. 113, 116-17, 299 A.2d 213, 214 (1973).

"[T]he evidence required to establish 'probable cause' need not amount to that required to convict . . . however, it must be more than that which gives rise to mere suspicion." *Commonwealth v. Dussell,* 439 Pa. 392, 397, 266 A.2d 659, 662 (1970).

---

1. The first of these was raised only by appellant Burgess.

Detective Frank S. Allenbach testified at appellant Hill's suppression hearing. The defense offered no evidence and relied solely on argument. Detective Allenbach stated that he received a message over police radio to proceed to the vicinity of Mattero's Junk Yard. The message indicated that Molettiere's Market had been robbed and the robbers were seen running in the direction of the junk yard. Other officers, who were on the scene and had cordoned off the field surrounding the junk yard, gave Allenbach descriptions of the robbers. Approximately one hour after the robbery, Allenbach observed two men running through the field. Another officer stopped the men. As they fit the description of the robbers, Allenbach placed them under arrest and searched them.

On the basis of Allenbach's testimony, the court found probable cause for the arrest. The one hour gap between the robbery and the apprehension of appellants was not fatal to this finding, because the area where appellants were arrested was cordoned off by the police so that no one could enter or leave it, and appellants matched the description of the robbers given Allenbach by the other officers at the scene. This combination of factors was sufficient to establish probable cause. *Commonwealth v. Hicks,* 434 Pa. 153, 253 A.2d 276 (1969), and *Commonwealth v. Berrios,* 437 Pa. 338, 263 A.2d 342 (1970), are distinguishable. *See Whiteley v. Warden,* 401 U.S. 560 (1971); *Commonwealth v. Sharpe,* 449 Pa. 35, 296 A.2d 519 (1972) and *Commonwealth v. Gilmore,* 447 Pa. 21, 288 A.2d 757 (1972). Probable cause to arrest having been found, there was probable cause for the search incident to that arrest. *Sibron v. New York,* 392 U.S. 40 (1968).

At the trial, testimony was given by, among others, Molettiere, one of the victims of the crime,[2] and various

2. The other victim, Caroline Stauffer, was a customer in the store at the time of the robbery. She was unable to identify either of the robbers because one of them knocked off her glasses.

police officers, including Officer Guenst, the first officer to respond to Molettiere's call to the police. According to Guenst, Molettiere gave him this description of the robbers: "two black males, one tall and thin in dark jacket, and one shorter, stocky build." Molettiere told him which way the two robbers had fled, and he set out in pursuit. On his way he met some boys,[3] who told him they had observed two men who fit Molettiere's description, running toward Mattero's Junk Yard. As a result of this information, he changed direction, and sent a message over the police radio. In response to the message, police, arriving from several directions, cordoned off the junk yard. Upon observing two men running through the yard, one officer shouted, "Halt, halt", and both appellants were apprehended. This testimony was contradicted by Molettiere in that Molettiere stated three times that he never gave Guenst a description of the robbers. Appellants contend that this conflict between Guenst and Molettiere at the trial[4] somehow affected the finding of probable cause at the suppression hearing. We cannot agree with this proposition. As has been noted, probable cause at the suppression hearing was determined from Detective Allenbach's testimony. *Commonwealth v. Gilmore, supra.* Subsequent conflicting testimony by other witnesses raised an issue of credibility for the trier of fact. It did not have any retroactive effect.

The third issue concerns whether a mistrial should have been declared in response to either or both of two motions for mistrial.

The first motion for mistrial was made when Molettiere gave an answer from which, defense counsel argued,

---

3. The testimony of the officer was, as appellants argue, inconsistent to the extent that at one point he said there were two boys, while at another he said there were three.

4. There were other conflicts as to the details of the robbers' appearance, although as to the overall description the testimony was consistent.

the jury could infer that appellant Burgess had a criminal record. With certain exceptions not pertinent here, see *Commonwealth v. Wable*, 382 Pa. 80, 114 A.2d 334 (1955), *Commonwealth v. Williams*, 227 Pa. Superior Ct. 103, 323 A.2d 135 (1974), the admission of evidence of a defendant's criminal record is reversible error. *Commonwealth v. Turner*, 454 Pa. 439, 311 A.2d 899 (1973); *Commonwealth v. Clark*, 453 Pa. 449, 309 A.2d 589 (1973). However, "[t]o warrant a characterization as prejudicial the testimony must convey to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense." *Commonwealth v. Banks*, 454 Pa. 401, 411, 311 A.2d 576, 581 (1973). In addition, in appraising prejudice it may be important whether the defendant himself invited the answer. *Commonwealth v. Dalton*, 199 Pa. Superior Ct. 388, 185 A.2d 653 (1962).

In response to questioning by counsel for appellant Burgess, Molettiere testified as follows:

"Q. Did you have occasion to speak with either of these gentlemen over the phone?

A. Yes, sir, I had a phone call.

Q. You had a phone call. Who was that call from?

A. He said it was Burgess.

Q. Burgess?

A. He said he was out of jail."

Appellants contend that this was an unsolicited answer that indicated that Burgess had been in jail at some time for the commission of another crime. If Molettiere's answer had been to a question posed by the Commonwealth, the issue of mistrial would have been troublesome.[5] However, the answer was to a question by the defense, and it is by no means clear that it was unsolicited. Molettiere might easily have understood the last

---

5. It should be noted, however, that the jury might have thought that Burgess had been in jail because of his arrest on the charges it was hearing, and not for the commission of another crime.

question, "Burgess?", as challenging the accuracy of his immediately preceding answer. In fact, unless counsel had not heard the answer, no other reason for asking "Burgess?" is apparent. On this understanding the witness might naturally reply by supporting his identification by quoting what the person with whom he had been talking had said. Moreover, the trial judge gave a prompt curative instruction to the jury; and neither the prosecution nor the defense pursued the matter. In these circumstances the denial of the motion for mistrial will not be disturbed.

The second motion for mistrial was made after testimony for the Commonwealth by Detective James Hansley, directly contradicting the testimony of Molettiere. Molettiere had testified that while he was in the hospital, the police brought both appellants into his room, but that at that time he could not identify them as the robbers. The detective, however, testified:

"By Mr. Levin [Assistant District Attorney]

Q. Was an identification made [at the hospital by Mr. Molettiere]?

A. Mr. Molettiere said he believed that Mr. Hill was one of the individuals who assaulted him.

MR. KING [counsel for appellant Burgess]: Excuse me. You will have to speak up. I didn't hear that.

THE WITNESS: I said Mr. Molettiere stated he believed Mr. Hill was one of the individuals who assaulted him. But he said that his appearance had changed from the time of the assault until the time of the apprehension when he viewed him in the emergency room."

Defense counsel objected that this testimony was hearsay. The Assistant District Attorney replied that it was nevertheless admissible "as a res gestae." The trial judge, observing that the testimony narrated a conversation that had occurred one hour after the robbery, sustained

defense counsel's objection, and then instructed the jury as follows:

"THE COURT:

Members of the Jury, I am going to ask you to disregard those last several remarks by Detective Hansley on the ground that what he was testifying to was hearsay. It's not what he saw himself but what another person's recollection was. You might recall that Mr. Molettiere was already on the stand and he said he had no recollection at the time he was in the hospital.

The hearsay evidence rule is a rule of exclusion on the basis that if you tell what somebody else should testify to in court, counsel cannot cross-examine the witness as to what they base that opinion upon or that testimony upon. If they had the person who made the statement then they could cross-examine him, but that person in this case in particular, was already on the stand and didn't say that. He said he didn't remember.

Ordinarily when you try to testify to what someone else said on another occasion, that person never does appear in the courtroom and never is subject to cross-examination to determine whether they had a good opportunity to observe, whether they had a good recollection, or any other factor. Detective Hansley necessarily was not there during the robbery and he doesn't know of his own knowledge what took place there. So it would have to be Mr. Molettiere's testimony direct in court here, and not Detective Hansley's testimony as to the identification."

Following this instruction, counsel for appellant Hill asked for a mistrial, stating, "Your Honor, I take issue with your direction as to the hearsay law. I think it was complete, but I think the damage was done by saying that he identified him. I don't know any type of salvation at this point." The Judge denied the motion for a mistrial and again cautioned the jury:

"THE COURT:

Members of the Jury, remember what I told you about the hearsay rule. It is a rule of exclusion. Therefore I will repeat to you again, disregard the remarks made by Detective Hansley as to identification in the hospital, especially in view of the fact that Mr. Molettiere who could come in on direct examination himself, testified that he does not remember or he could not identify Mr. Hill at the hospital."

It seems to be conceded by the Commonwealth that the trial judge was correct in sustaining defense counsel's objection to the detective's testimony, for the statement by Mr. Molettiere lacked the spontaneity necessary to qualify for the res gestae exception to the hearsay rule. *See generally* McCormick, Evidence 686 *et seq.* (2d ed. 1972). The question, therefore, is whether the judge's curative instructions to the jury were adequate.

We have concluded that the instructions were adequate. In the first place, they were both vigorous and clear, and could not have been overlooked or misunderstood by the jury. In the second place, in fact the testimony was not hearsay, and had the assistant district attorney argued differently in support of the testimony, it could and should have been admitted.

Hearsay is "testimony in court . . . of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein and thus resting for its value upon the credibility of the out-of-court asserter." McCormick, *supra* at 584. Such a statement is not admissible unless it falls within an exception to the hearsay rule. However, if the statement is not offered to prove the truth of the matter asserted but to impeach a prior witness by showing a self-contradiction, it is not hearsay. McCormick, *supra* at 601.

"In short, the *prior statement is not primarily hearsay*, because it is not offered assertively, i.e., not testimonially. The hearsay rule . . . simply forbids the

use of extrajudicial utterances as credible testimonial assertions; the prior contradiction is not offered as a testimonial assertion to be relied upon. It follows, therefore, that the use of prior self-contradictions to discredit is not obnoxious to the hearsay rule." 3A Wigmore, Evidence §1018 (Chadbourn rev. 1970). *See also, Commonwealth v. Rothlisberger*, 197 Pa. Superior Ct. 451, 178 A.2d 853 (1962).

In the present case, the detective's testimony that Molettiere had identified appellant Hill as one of the robbers, when appellants were brought into the hospital room, contradicted Molettiere's testimony that he had not made such an identification. The testimony was therefore admissible to impeach Molettiere. It is true that this would have represented an attempt by the prosecution to impeach one of its own witnesses. However, "[w]hile as a general rule a party who calls a witness represents him as being worthy of belief and cannot impeach him, this rule has been considerably relaxed to prevent injustice and the tendency of the courts is to permit parties to show the truth without strict regard to technicalities." *Commonwealth v. Gomino*, 200 Pa. Superior Ct. 160, 188 A.2d 784 (1963) (collecting cases). *See also*, Fed. R. Evid. 607, allowing any party, including the party who called the witness, to attack the witness's credibility.

The detective's testimony was also admissible for the truth, and not only for impeachment. Some authorities have concluded that prior contradictory statements should in any case be admissible for the truth. *See, e.g.,* 3A Wigmore, *supra* at 996. That is not, however, the orthodox view, which limits admissibility to impeachment. *Commonwealth v. Carr*, 436 Pa. 124, 259 A.2d 165 (1969); *Commonwealth v. Rothlisberger, supra; and see Ruhala v. Roby*, 379 Mich. 102, 150 N.W. 2d 146 (1967) (full discussion). Even so, and without abandoning the orthodox view, a special case should be recognized where the prior statement is one of identification. The case given by McCormick is directly on point:

"*Statements of identification.* When A testifies that on a prior occasion B pointed to the accused and said, 'That's the man who robbed me,' the testimony is clearly hearsay. If, however, B is present in court and available for cross-examination, a case within the present section is presented. Similarly if B has himself testified to the prior identification. Admissibility of the prior identification in all these situations has the support of substantial authority in the cases, often without recognition of the presence of a hearsay problem. Recent statutes and rules also favor admissibility. Justification is found in the unsatisfactory nature of court room identification and the safeguards which now surround staged out-of-court identifications." McCormick, *supra* at 603 (footnotes omitted).

Accordingly, since the trial judge's cautionary instructions to the jury were adequate, and since the testimony could have been admitted anyway, the motion for mistrial was properly denied.

The fourth issue is whether a motion for mistrial should have been granted because of certain alleged remarks by the court crier in the presence of the jury panel, that "We will send the Sheriff down to pick up the prisoners," and "When the Jury comes in you can have the prisoners brought up." Appellants claim that these remarks denied them an impartial jury. However, the trial judge made inquiry into this matter and both the crier and a witness stated that what had been said was to "bring them up," and that the word "prisoners" had not been used. The trial judge chose to believe these statements. In these circumstances the denial of the motion for mistrial was within his discretion.

The fifth issue is whether the testimony of Chief of Police Wallace Hendricks, that the police "had cordoned off the area around the Junk Yard," was conclusory and therefore took away a factual issue from the jury. The trial judge ruled that, even though Hendricks was only

one person, he was the Chief of Police and in that capacity he could testify to the totality of police operations. Without deciding the correctness of this ruling, it is enough to note that "cordoned off" is more descriptive than conclusory; in any event, ample opportunity to challenge the "conclusion" and the basis for it existed in cross-examination.

The sixth issue is whether the trial judge erred in admitting various Commonwealth exhibits into evidence.

The first exhibit complained of was a roll of money, totalling $239.00, held by a rubber band and arranged so that all the bills of a given denomination were together. This roll was taken from one of appellants, when they were apprehended. There is no question that it was properly admitted as having been taken from Molettiere. Molettiere testified that he had carefully arranged the money from the sale of lottery tickets so that all of the bills of a given denomination were together, and that he had put a rubber band around the bundle of bills. Appellants object that he first informed the police that $270.00 was taken. However, the initial calculation of $270.00 was an approximation made by Molettiere immediately after the robbery. Upon careful subsequent calculation of his lottery receipts, he revised this to $239.00.

Exhibits C-2, C-3, and C-4 were also properly admitted. C-2 was a copy of a money order that had been written on Molettiere's check-writing machine, which was also taken in the robbery. C-3 was a check-writing machine seized in Mattero's Junk Yard, near the spot where appellants were apprehended. Molettiere testified, without objection, that each check-writing machine had its own identification number, and that this number appeared on every check written with that machine. C-4 was a piece of paper. During the trial this was inserted into the machine, C-3, with the result that the machine printed onto it the same number as appeared on C-2. Thus, together

C-2 and C-4 proved the ownership of C-3. Appellants claim that there was no evidence that a check-writing machine was taken in the robbery. However, when Molettiere was asked what was taken, he said a "check-writing machine." He was then asked when he discovered that the machine was missing, and replied: "Right after the robbery. After I came back from the hospital I discovered the check-writing machine was gone." While he did not see the machine taken, the circumstances he described were such as to support an inference that it had been taken, *Commonwealth v. Hickman*, 453 Pa. 427, 433, 309 A.2d 564, 568 (1973), besides which, if C-2 and C-4 were accepted, they proved that the machine found in the junk yard had come from Molettiere's Market.

Exhibit C-12 was also admissible. It was a can of Frankford brand tomatoes that Molettiere said was taken in the robbery and that was found in the junk yard near the check-writing machine.

Exhibit C-9 comprised a red hat and black wig, also found near the spot where appellants were apprehended. The hat was mentioned by the officers who assisted in the arrest as having been reported as part of the apparel of one of the robbers. As mentioned above, after appellants were arrested, they were taken to the hospital to see if Molettiere could identify them. While no positive identification ensued, Molettiere told one of the officers that he did not think that one of the men who robbed him was bald. The fact that one of appellants is bald, and the further fact that a wig was found with a hat near the spot where appellants were apprehended, could together be regarded by the jury as tending to explain the discrepancy between what Molettiere observed during the robbery and the appearance of appellants in the hospital. The admission of the hat and wig was therefore within the discretion of the court. *Commonwealth v. Hickman, supra* at 432, 309 A.2d at 566.

558 

The eighth issue is whether the court erred in denying appellant's demurrer to the evidence. The foregoing discussion has sufficiently indicated what the evidence was. In evaluating it, the standard is whether, giving the Commonwealth the benefit of all evidence favorable to it, and of all inferences reasonably drawn therefrom, it would support a verdict of guilty. *Commonwealth v. Carroll*, 443 Pa. 518, 278 A.2d 898 (1971); *Commonwealth v. Mason*, 211 Pa. Superior Ct. 328, 236 A.2d 548 (1967); *Commonwealth v. Dennis*, 211 Pa. Superior Ct. 37, 234 A.2d 53 (1967). Although the evidence was not in every respect consistent, when measured by this standard it was sufficient.

The ninth issue is whether the court during its charge committed prejudicial error by misstating certain critical evidence and by failing to review any inconsistencies brought out on cross-examination. Counsel for appellants made various specific objections to the charge at its conclusion. The trial judge then proceeded to amend his charge in accordance with these objections. At the conclusion of the amended charge the judge asked if there were any other additions or corrections, and no further objections were made. Accordingly, the objections now made will not be heard. *Commonwealth v. Taylor*, 453 Pa. 539, 309 A.2d 367 (1973); *Commonwealth v. Zapata*, 447 Pa. 322, 290 A.2d 114 (1972).

The tenth issue is whether the court erred in sentencing appellants on both assault and battery and aggravated assault and battery. We have concluded that the court did err.

A single indictment (No. 3953) charged appellants with assault and battery and aggravated assault and battery against the same individual, Caroline Stauffer, and both of these charges arose out of the same criminal incident, *i.e.*, the robbery of Molettiere's Market on December 11, 1972. In deciding whether these charges merge, "[t]he true test . . . is . . . whether one crime

necessarily involves another . . . ." *Commonwealth v. McCusker,* 363 Pa. 450, 457, 70 A.2d 273, 276 (1950), citing *Commonwealth ex rel. Moszczynski v. Ashe,* 343 Pa. 102, 21 A.2d 920 (1941).

> "The principle of merger prevents double punishment for a lesser offense when it is a necessary ingredient of the greater offense for which the defendant has also been indicted, convicted and punished." *Commonwealth v. Nelson,* 452 Pa. 275, 280, 305 A.2d 369, 371 (1973) (concurring and dissenting opinion by NIX, J.), citing *Commonwealth v. McCusker, supra,* and *Commonwealth ex rel. Shaddock v. Ashe,* 340 Pa. 286, 17 A.2d 190 (1941); *Commonwealth ex rel. Russo v. Ashe,* 293 Pa. 322, 142 A. 317 (1928); *Commonwealth v. Phillips,* 215 Pa. Superior Ct. 5, 257 A.2d 81 (1969).

Thus, the misdemeanor of aggravated assault and battery merges with the felony of assault with intent to kill, *Commonwealth v. Soudani,* 398 Pa. 546, 159 A.2d 687 (1960) ; assault with intent to ravish merges with rape, *Commonwealth ex rel. Russo v. Ashe, supra;* and assault and battery in resisting arrest and unlawfully resisting an officer in making an arrest merge with assault and battery, *Commonwealth v. Nelson, supra.*

An assault is an attempt by violence to hurt another; a battery occurs when the violence is accomplished. *Butler v. Stockdale,* 19 Pa. Superior Ct. 98 (1902). An aggravated assault and battery involves the unlawful and malicious infliction "upon another person, either with or without any weapon or instrument, [of] any grievous bodily harm . . . ." Act of June 24, 1939, P.L. 872, §709, 18 P.S. §4709. Thus assault and battery is a lesser offense than aggravated assault and battery. Moreover, here the one offense "necessarily involved" the other for once the aggravated assault and battery had been proved, no additional facts were necessary to prove the assault and battery. The two offenses therefore merged. Accordingly,

pursuant to this court's inherent power to amend sentence, *Commonwealth v. Lovett,* 218 Pa. Superior Ct. 201, 275 A.2d 835 (1971), on Indictment No. 3953 the judgment of sentence imposed on the aggravated assault and battery count will be affirmed but the judgment of sentence imposed on the assault and battery count will be vacated.

The final issue is whether the sentences should be vacated as manifestly excessive.

As noted in the statement of the case, each appellant was sentenced to a series of consecutive sentences that in total came to 23½ to 47 years. (Because of the merger on Indictment No. 3953, this total will be reduced to 22½ to 45 years.) So far as appellant Hill is concerned the sentences will not be disturbed, but so far as appellant Burgess is concerned they cannot stand.

The sentencing judge made a statement explaining his reason for the sentences imposed. *See Commonwealth v. Garramone,* 307 Pa. 507, 161 A. 733 (1932) ; Rule 46 of the Rules of the Superior Court. However, so far as Burgess is concerned, that statement demonstrates not that the sentences were proper but that they were manifestly excessive.

The sentences were imposed on December 31, 1973. Burgess was sentenced first, and then Hill; the same attorney represented both men.[6] When Burgess was

6. The court had ordered no pre-sentence report on either man. There can be no question that in a case as serious as these, it is better practice to obtain a pre-sentence report. American Bar Association Standards Relating to Sentencing Alternatives and Procedures §4.1 *et seq.* (Approved Draft, 1968). Nevertheless, we make no issue here of the court's failure to do so. The pertinent rule of court left it to the court's discretion whether to obtain a pre-sentence report. Pa. R. Crim. P. 1403. We do not suggest that this discretion may not be abused, but here counsel did not request a pre-sentence report or otherwise develop a record demonstrating abuse of discretion. *Cf., Commonwealth v. Shoemaker,* 226 Pa. Superior Ct. 203, 313 A.2d 342 (1973).

called for sentencing, the assistant district attorney stated to the court that "in light of the prior record of Mr. Burgess," he recommended a sentence of 23½ to 47 years.

Regrettably—and this would not be so had a presentence report been obtained—the record is not entirely clear as to just what was Burgess's prior record. According to the assistant district attorney:

"Mr. Burgess has a prior conviction in this County of burglary and robbery in 1967 before Judge HONEYMAN.

THE COURT: Armed robbery?

MR. NICHOLAS [the assistant district attorney]: Yes, sir.

Apparently, I think there were two separate court terms and numbers involved in 1967 and he was sentenced to two (2) to ten (10) years. Then, apparently—

THE COURT: He was paroled on that one?

MR. NICHOLAS: Then apparently, there was a parole violation subsequent to that sentence of Judge HONEYMAN posed [sic] and, of course, this offense constitutes a new parole violation. I do have familiarity with the facts of this case . . . ."

According to counsel for Burgess, however:

"On behalf of Mr. Burgess, I would state to the Court that I think it came out at the trial that Mr. Burgess is a 33-year-old man, married and has 5 children. He was employed at the time, employed by the Ivy Hill Paving Company and earning a net pay of approximately $150.00 a week. He's been continuously incarcerated for almost 13 months, since the date of this occurrence.

THE COURT: He is a parole violator, is that correct?

MR. PRINCE [counsel for Burgess]: No, that's incorrect, your Honor, the parole violation was dismissed. They were, basically, he had domestic problems, non-support problems.

THE COURT: Wasn't a detainer placed on him as soon as he was arrested here by his probation officer?

MR. PRINCE: Yes, there was, but—

MR. NICHOLAS: He had a two (2) to ten (10) year sentence before Judge HONEYMAN, so he was still on parole."

In any event, whatever may be the facts as to Burgess's parole violation, evidently his prior record included only one conviction. Following these colloquies regarding Burgess's record, the transcript continues:

"MR. PRINCE: On behalf of Mr. Burgess, I would not make any specific recommendation for years, because I find it impossible to come to this court and to say to you, well, I think this man should be sentenced to any specific number of years. I think it's likewise impossible for the District Attorney to say, 'I recommend 23½ to 47 years.' I think the District Attorney is using these amounts of years without serious consideration of the impact. Yes, society must be protected. Yes, a man must be punished, but he also must be rehabilitated. Who's to say whether it should be one (1) year or—

THE COURT: Society has tried rehabilitation with this man and it hasn't worked. You hear all of these stories, so prison hasn't worked. We have two alternatives, incarceration or put a man out on the street, trust him and let him take his place in society again. This young man has had this chance several times and he just hasn't lived up to the break society gave him.

How do we protect society except to warehouse a man to protect society from having him ravaging on them?

MR. PRINCE: Well, after this sentencing, you will have the sentencing of Mr. Hill. There are two completely different backgrounds with these two individuals, as the record will show. Mr. Burgess has

got one major conviction, that's armed robbery, before Judge HONEYMAN in 1967. Mr. Hill, on the other hand, has 5 or 6 major convictions. As a matter of fact, at the time of this offense, he was an excapee [*sic*] from Dallas; not so with this individual, he was employed and he was working. He had his domestic relations problems, yes, that's on the record, but the only major offense is that previous one before Judge HONEYMAN. I am not objecting and saying that we should put this man on probation, I think I'd be a fool if I said that. I am objecting to the use of the maximum sentence of 23½ to 47 years . . . ."

There then ensued further argument, the tone of which reflected credit on neither counsel, and the court imposed sentence.

After Burgess had been sentenced, Hill was called for sentence. As counsel had predicted, it at once developed that Hill's background was indeed very different from Burgess's. Specifically, according to the assistant district attorney's statement to the court, the facts were: "that he was convicted in 1940 of the crime of armed robbery, that he was convicted in 1950 of the crimes of burglary, larceny and receiving stolen goods, that he was convicted in 1957 of the crimes of burglary and larceny, that he was convicted in April of 1969 of the crimes of robbery while armed together with an accomplice, aggravated robbery and, of course, this offense which was aggravated robbery."

This record demonstrates that the court in sentencing Burgess abused its discretion. We do not find any abuse so far as Hill's sentences are concerned. To be sure, the sentences were, in total, severe—more severe in practical effect than a person convicted of first degree murder and sentenced to life imprisonment might serve. Nevertheless, the court was within its discretion in regarding Hill as so incorrigible that the only way to protect the community from further depredations by him was to in-

carcerate him for the longest period permitted by law. The same, however, cannot be said, at least on this record, of Burgess. In the first place, the court misstated the record, by referring to Burgess as though he had committed repeated offenses. In the second place, the court imposed the same sentence on a man who had committed only one prior offense as it imposed on a man who had committed six. We do not suggest that every situation where co-defendants are sentenced will require proportionment of sentences according to past criminal records; but here the difference in past records is significant. Each case raising the issue of excessive sentence must be reviewed on the circumstances of that case alone, recognizing that the trial judge has broad discretion in imposing sentence, and that if the sentence imposed is within statutory limits, there is no abuse of discretion unless the sentence is manifestly excessive so as to inflict too severe a punishment. *Commonwealth v. Hill*, 453 Pa. 349, 310 A.2d 88 (1973); *Commonwealth v. Person*, 450 Pa. 1, 297 A.2d 460 (1972); *Commonwealth v. Wrona*, 442 Pa. 201, 275 A.2d 78 (1971); *Commonwealth v. Cox*, 441 Pa. 64, 270 A.2d 207 (1970).

The judgments of sentence of appellant Walter Hill are affirmed, except on Indictment No. 3953 the judgment of sentence imposed on the assault and battery count is vacated. The judgments of sentence of appellant Walter A. Burgess are vacated and the matters remanded · for further sentencing consistent with this opinion.

----

CONCURRING AND DISSENTING OPINION BY JACOBS, J.:

Although I agree with the majority's treatment of the first ten issues raised on appeal, I cannot agree that the lower court abused its discretion in sentencing appellant Burgess. "The trial judge has broad discretion in imposing sentence. If the sentence imposed is within statutory limits, there is no abuse of discretion unless

the sentence is manifestly excessive so as to inflict too severe a punishment. This court has the power to modify an obviously excessive sentence, but has rarely utilized that power, preferring instead to rely on the good judgment of the trial judge." *Commonwealth v. Riggins*, 232 Pa. Superior Ct. 32, 34, 332 A.2d 521, 522 (1974) (citations omitted).

A defendant's prior criminal record is only *one* of many factors to be considered by the trial judge in imposing sentence. Where, as in the present case, a defendant's sentence is within the statutory limits, the mere fact that he has committed fewer prior criminal offenses than a co-defendant does not require that he receive a correspondingly lesser sentence than the co-defendant.

For these reasons, I would not disturb the sentence of the court below.

WATKINS, P. J., and VAN DER VOORT, J., join in this opinion.