Duffy *v.* National Janitorial Services, Inc.,
Appellant.

Argued January 5, 1968.   Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS,
JJ.

*C. Howard Harry, Jr.,* for appellant.

*Louis C. Bechtle,* with him *Morris Gerber,* for appellees.

OPINION BY MR. JUSTICE MUSMANNO, April 16, 1968:

Edward B. Duffy was the owner of a building at 104 North York Road, Hatboro. He and several other lawyers, all plaintiffs in this case, occupied the building in the practice of the law. The National Janitorial Services, Inc., defendant in the case, entered into a contract with the plaintiffs to perform certain services consisting of cleaning offices, emptying waste baskets, emptying ashes from the incinerator and removing trash and ashes.

On the night of May 7, 1963, a fire broke out in the plaintiff's offices causing considerable damage, and the plaintiffs brought suit in trespass against the National Janitorial Services, charging it with negligence in the service it rendered the plaintiffs.[1]

In the ensuing trial the jury returned a verdict in favor of the plaintiffs in the sum of $37,011.05, and

---

[1] The Philadelphia Electric Company, the Tri-County Construction Company and James Rowe were brought in as additional defendants but the court entered a compulsory nonsuit in their favor, and no appeal was taken from that action of the court.

the defendant has appealed, seeking judgment n.o.v. or, in the alternative a new trial. The defendant contends that the plaintiffs failed to prove any negligence on its part. It is admitted that on the night of May 7, 1963, Lewis McKinney, an employee of the defendant, was on the Duffy premises performing his janitorial services. In the course of this employment he withdrew ashes from the incinerator and placed them into a cardboard box, which he deposited in the basement of the building. The plaintiffs submitted as their thesis during the trial that it was the consignment of the ashes to the inflammable container which ignited the ruinous fire.

Carbutt W. Alman, the Hatboro Fire Chief, and Sergeant Kiggins, the State Police Fire Marshal, testified that in their expert opinion, after inspecting the gutted building, the fire had begun in the cardboard box which nestled close to a small table, that the resulting flames burned through the table up to a gas meter, which melted, causing gas to escape, and that all these elements combined in combustion to precipitate a conflagration.

It would not be unreasonable to conclude, and evidently the jury did so conclude, that it was the dumping of the ashes into a cardboard box which produced the blaze which worked the destruction of which the plaintiffs complain. But, the defendant contends, the facts do not warrant such a conclusion. It insists that the ashes thrown into the cardboard box were cold, and that the jury could not find otherwise because McKinney testified he had stirred the ashes with his hand. The defendant argues further that since the plaintiffs called McKinney as their witness, they were bound by his testimony,[2] and that, therefore, the ashes had to be cold.

---

[2] "It is true, as a general rule, a party cannot be permitted to impeach the veracity of his own witness, yet, he may disprove

When men and women leave their homes and occupations to perform jury duty, they are not required to leave behind them their common sense. Their evaluation of what is reasonable and credible is part of their equipment as jurors, and if they conclude that, when McKinney said he had churned the ashes with his fingers to find out if they were cold, he was adding an ice cube of invention to his memory of that hot night, the jurors cannot be accused of capriciously ignoring his testimony. In that respect, the jurors could well have reasoned that no sensible person would dip his hands into what might well have been hot ashes to find out if they were really hot. There are many ways of skinning a cat, the proverb says, and there are many ways of determining if a stove is hot without sitting on it.

The jury could well find that McKinney was negligent from the beginning in placing ashes into so easily ignitable a substance as a paper box. All ashes, including those of broken dreams, had at one time to be ardent. Thus, in the center of those remnants of what was once a crackling incandescence, there can always be an ember which needs but a slight breeze or a breath of hope to blaze anew.

Why would McKinney subject himself to the peril of roasted fingers by a digital plowing of fire relics when he could easily have assured himself of a non-injury by pouring water over the perilous substance he was handling? Also the jury could well have asked, in testing McKinney's credibility, why it did not occur

the facts to which his witness has testified": *P.R.R. Co. v. Fortney*, 90 Pa. 323, 328. "The mere fact of calling a witness does not mean that the party thereby admits as true everything the witness may say, and he is not estopped from proving the facts to be otherwise by other evidence": Henry, Pennsylvania Trial Evidence (2d ed.), §476.

to him to place the ashes in a tin can or other metal container so as effectively to insure noninflammability.

Within the scope of our decision in the case of *Smith v. Bell Telephone Co. of Pa.,* 397 Pa. 134, the jury was justified in reaching its conclusion that it was the manner in which the defendant's employee disposed of the ashes taken from the incinerator which caused the plaintiffs' losses.

In its bid for a new trial, the defendant argues that the trial court erred in not allowing the defendant to call as an expert one Alexander Marks to present his opinion on the origin of the fire. The judge, after questioning the offered witness, concluded that he was not qualified to state an authoritative opinion on the facts of the case. The court said, and the record bears out his statement, that Marks had never attended any institute or seminar dealing with fire causation and had attended the scenes of but few fires in his life. The witness may have been an expert in some other field, but, in the proper exercise of his discretion, the trial judge ruled that he was not qualified to express an opinion as an expert in fire causation.

The trial judge has wide discretion in matters of this kind. *Jerome v. Laurel Pipe Line Co.,* 197 Pa. Superior Ct. 131; *Steele v. Shepperd,* 411 Pa. 481, and we do not find in this case that the judge abused his discretion in not allowing Marks to give his opinion on the origin of the fire.

The defendant also avers that the judge erred in not reading to the jury several points for charge which it submitted. A reading of the court's entire charge reveals that the law embraced in the submitted points were amply covered in the judge's instructions.

Nor do we find substantiated the defendant's complaint that the court erred in instructing the jury on

the law of contributory negligence or that his charge was inadequate or confusing.

Judgment affirmed.

Mr. Justice JONES, Mr. Justice EAGEN, Mr. Justice O'BRIEN and Mr. Justice ROBERTS concur in the result.

Mr. Chief Justice BELL dissents.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The writer of the majority opinion apparently operates under the self-created irrebuttable presumption that the plaintiffs must recover. Fortunately, the law, reason and logic have not yet seen fit to create such a presumption. Not wedded to this presumption, I feel compelled to express my disagreement with the result reached by the majority of this Court.

Plaintiffs' theory of the case was as follows: On the night in question defendant's employee negligently placed hot ashes in a cardboard box under a table in the basement heating room, which box subsequently caught fire causing the table to generate and apply heat to the gas meter resulting in the fire damaging plaintiffs' property. In an effort to establish defendant's negligence, based upon the doctrine of *respondeat superior*, plaintiffs produced as their witness defendant's employee who allegedly committed the tortious act causing the fire. On direct examination the employee testified in pertinent part as follows: "Q. And did you empty some ashes out of that incinerator? A. Empty some ashes out? Q. Yes. A. Yes, from the night before, when I first went in. Q. When you first went in you emptied some ashes out of the incinerator? A. Yes. Q. What did you empty them in? A. A container. Q. What kind of a container? A. Box. Q. Cardboard box? A. Cardboard box that Duffy had in there. Q. And then did you place that, or leave that,

in the heater room? A. Yes, along the wall right in front of the heater. Q. All right. And this is the heater shown on Exhibit D-2? A. Yes. . . ."

The employee testified on cross-examination as follows: "Q. Now, the cardboard boxes that you're referring to along the wall, were they near the incinerator or were they near the wall where the gas meter was? A. They were along the wall right in front of the incinerator. . . . Q. . . . where was the door that was used to come in and out of the incinerator room? Was it near the incinerator or near the gas meter? A. Yes, near the incinerator. . . .

"Q. Would it be necessary for you to walk completely across the room to put ashes in a box across underneath the gas meter? Would you have to walk completely across the room, or would the cardboard box near the door be more convenient? A. No, near the door. I emptied it in the box near the door. Q. Did you at any time ever put any ashes in a cardboard box under a gas meter? A. No, I didn't. . . .

. . .

"Q. Did you ever dust it or touch it or do anything about it? A. No, I didn't go that far back. Q. Do you know what was even there? A. No, I don't. Just a table, that's all. . . .

. . .

"Q. What procedure did you follow then? A. Well, when I first went in I always checked the incinerator, you know, see had anyone burned any trash that day, you know. . . .

. . .

"Q. What did you do then with what was in there then? A. I pulled the bottom tray out and I checked the ashes, you know, stirred to see was it cold. If it be cold I would pour the ashes in the box. Q. The ashes from the day before? These ashes were from

May the 6th, the day before, is that correct? A. Yes. Q. And were they cold ashes? A. Yes. Q. Did you ascertain that fact? A. Yes. Q. After you had taken them out from the incinerator, where did you put them? A. I put them in the box along the wall in front of the incinerator. Q. Is that anywhere near the box referred to under the gas meter? A. No. . . ."

Redirect examination revealed that the employee determined that the ashes were cold by stirring them with his hand in order to feel if they were hot. In essence the employee viewing his entire testimony testified that (1) the ashes were cold and (2) he never put ashes in the cardboard box under the table next to the gas meter, but on the contrary deposited the ashes in a box located near the door of the heater room some ten to twelve feet away from the alleged origin of the fire. Despite this uncontradicted testimony, the court below and the majority of this Court hold that the question of defendant's liability was for the jury's determination, a conclusion which has absolutely no foundation in law, logic or reason. The law is quite clear in Pennsylvania with respect to uncontradicted testimony of a witness produced by a party to the action. In *Evans v. Penn Mutual Life Insurance Company of Philadelphia*, 322 Pa. 547, 558, 186 Atl. 133 (1936), Justice DREW speaking for a unanimous Court enunciated the general rule with respect to the uncontradicted testimony of one's own witness. He remarked: ". . . It is a fundamental doctrine in the common law that ordinarily a party may not, in the absence of surprise or other special circumstance, discredit his own witness or impeach his general credibility. Since a party may not cast doubt upon his witness's veracity, he will not be heard to claim that the credibility of the witness's uncontradicted testimony must be tested by a jury. Even where the wit-

ness is an adverse party, called as upon cross-examination, the party calling him is concluded by his testimony, if uncontradicted: Readshaw v. Montgomery, 313 Pa. 206, 209, and cases there cited. . . ."[1]

Plaintiffs, in their brief and at argument in an effort to circumvent the principles laid down in *Evans,* take the position that they produced sufficient contradictory testimony. After carefully and thoroughly perusing the record, I am unable to locate a scintilla of evidence contradicting the two essential facts testified to by defendant's employee. In order to establish liability, it was incumbent upon the plaintiffs to demonstrate that the ashes placed in the cardboard box were indeed hot, since that was the alleged negligent act. However, the only evidence in this regard was the employee's uncontradicted, unrebutted statements that he stirred the ashes and "they were cold." Since plaintiffs are bound by the uncontradicted testimony of their own witness, it is obvious that the most important aspect of their case could not be established, namely, that defendant's employee placed hot ashes in a cardboard box. Secondly, the employee testified, without contradiction, that he never deposited any ashes in the cardboard box under the table directly underneath the gas meter. Being bound by this testimony, plaintiffs likewise have failed to establish any nexus between the employee and the origin of the fire since there is absolutely no evidence suggesting

---

[1] *Smith v. Price,* 8 Watts 447; *Bank of Nor. Liberties v. Davis,* 6 W. & S. 285, 287; *Stearns v. Merchants' Bank,* 53 Pa. 490, 492; *Peoples Nat. Bank v. Hazard,* 231 Pa. 552, 555; *Dinger v. Friedman,* 279 Pa. 8, "As a general rule a party who produces a witness thereby holds him out as being worthy of belief": Henry, Pennsylvania Trial Evidence (2d ed.), §476. See Wigmore on Evidence (2d ed.), §896 et seq., for a full discussion and criticism of this rule.

that the employee actually put ashes in the particular cardboard box wherein the fire originated.

Moreover, plaintiffs seek to accomplish something which neither reason nor logic will or should permit. Here plaintiffs offer as their own witness defendant's employee who then testified completely contrary to plaintiffs' version of what actually transpired. Notwithstanding this uncontradicted testimony, plaintiffs still argue that their case, in any event, should be submitted to the jury since the jury could choose to disbelieve the employee and infer the opposite to be true. Thus, the jury could only find defendant's employee negligent by inferring from what they thought was false, that the opposite was true. In other words, plaintiffs seek to bottom their entire case on the theory that the jury should be permitted to reject their own witness' uncontradicted testimony as unworthy of belief and at the same time use the incredible testimony as positive evidence that the negative is true in order to establish the essential facts of negligence on the part of defendant. If the law were to permit a case of this nature to be submitted to the jury on that theory, it certainly would have the deleterious effect of opening the proverbial "Pandora's box" for almost every negligence case to be submitted to the jury.

Apparently the majority of this Court fails to recognize the awesome implications and ramifications of its decision which is not only contrary to the law in this Commonwealth, but defies all sound reasoning and logical explanation. For these reasons, I find it necessary to disassociate myself from the result reached by the majority.

I dissent.