368 A.2d 292

**David STACK and Rita Stack, Appellees,**

v.

**Paul M. WAPNER, M.D., I. E. Brownstein, M.D., and Irvin C. Arno, M.D., individually and as co-partners and Albert Einstein Medical Center, a Pennsylvania Corporation, Appellants.**

Superior Court of Pennsylvania.

Argued March 17, 1975.

Decided Sept. 27, 1976.

280

Charles Jay Bogdanoff, Philadelphia, for appellant, at No. 246.

Harry A. Short, Jr., Philadelphia, for appellants, at Nos. 262 and 279.

Albert S. Fein, Philadelphia, with him Fein, Criden, Johanson, Dolan & Morrissey, Philadelphia, for appellees.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This is a medical malpractice case in which a jury returned a verdict in the amount of $40,000 against all of the appellants after an eight-day trial.[1] In a thorough and scholarly unreported opinion, Judge McDevitt denied appellants' motions for judgment n. o. v. or for a new trial. We affirm.

The evidence, which is fully summarized in the trial judge's opinion, showed that appellee[2] was admitted to the Albert Einstein Medical Center in Philadelphia on August 16, 1962, to give birth to her fourth child. At the time of her admission, she was under the care of appellants Wapner, Brownstein, and Arno, physicians associated in a medical partnership. The evidence was conflicting concerning whether appellant Brownstein, who was in charge of appellee's case, was present at the time appellee entered the hospital. The hospital records, however, do not indicate that any of appellant doctors were present before the delivery of appellee's child at 8:30 a. m. on August 17. The entries on appellee's labor room chart were made either by a nurse or by Eugene Shuster, a physician who had recently begun his gynecological residency at appellant hospital. Dr. Shuster's alleged negligence formed the basis on which the hospital was made a defendant.

1. The jury found in favor of appellees David Stack and Rita Stack in the respective amounts of $15,000 and $25,000.

2. For the sake of convenience, we shall use the designation "appellee" to refer solely to Mrs. Stack.

Appellee's hospital chart indicates that at 2:45 a. m. she began to receive the drug Pitocin intravenously. Pitocin, the generic name of which is Oxytocin, is a drug employed by obstetricians to induce labor by causing contractions of the uterus. The labor room chart contains no notation that the administration of Pitocin was monitored, even though accepted medical practice calls for constant monitoring. Indeed, the chart is devoid of any indication that any check at all on appellee's condition was made between 2:30 a. m. and 5:15 a. m.; the latter entry is followed by one made at 7:05 a. m. The first reference on the chart to the presence of appellant Brownstein is as of 8:00 a. m., when he is noted as performing part of the delivery procedure.

Following the delivery, appellee began heavy intrauterine bleeding. When the attempted repair of a tear in appellee's uterus failed to stop the bleeding, appellant Arno was obliged to perform a total hysterectomy on appellee. In the course of the hysterectomy, appellee received a transfusion of six and one-half pints of blood.

Appellee was released from the hospital at the end of August, 1962, but was readmitted shortly thereafter suffering from severe infectious hepatitis. During her second hospitalization, appellee received medication that allegedly caused her to suffer partial hearing loss in both ears.

The theory of appellee's case was that the ruptured uterus, the hysterectomy, and all the ensuing medical misfortunes experienced by appellee, were caused by appellants' failure to monitor the administration of the Pitocin. This theory was supported by the expert testimony of Arthur Weinberg, a New York obstetrician and gynecologist. Dr. Weinberg testified that based on the absence of entries on appellee's labor room record, he was of the opinion that the medical care rendered appellee was not in conformity with accepted medical practice in Philadelphia in 1962. Appellants produced experts

who testified that the governing medical standards had been complied with. In addition, appellant Brownstein, called by appellee as on cross-examination, testified that he was present during the relevant period and checked on the administration of the Pitocin throughout the night. This testimony was corroborated by Dr. Shuster, who testified that "as certain as I can be," either appellant Brownstein or he watched the Pitocin drip throughout the night (Record 307–308a). In other parts of his testimony, however, Dr. Shuster testified that he had no independent recollection of what had happened (Record 285a–287a).

I

Appellants contend that there was insufficient evidence to support a finding of negligence on their part. In support of this contention, they argue that appellee was bound by the testimony of appellant Brownstein and Dr. Shuster that appellant Brownstein had monitored the administration of Pitocin, and that even if appellee was not so bound, the "positive" evidence provided by the testimony of these two doctors could not be overcome by the "negative" evidence of the absence of entries on appellee's labor room chart.

A

Appellant Brownstein, called by appellee as on cross-examination, testified that he had been present at the hospital and had monitored the administration of Pitocin to appellee. The conclusiveness *vel non* of this testimony is governed by the Act of May 23, 1887, P.L. 158, § 7, 28 P.S. § 381, which provides, in part, as follows:

In any civil proceeding, whether or not it be brought or defended by a person representing the interests of a deceased or lunatic assignor of any thing or contract in action, a party to the record, or a person for whose immediate benefit such proceeding is prosecuted or de-

fended . . . or any other person whose interest is adverse to the party calling him as a witness, may be compelled by the adverse party to testify as if under cross-examination, subject to the rules of evidence applicable to witnesses under cross-examination, and the adverse party calling such witnesses shall not be concluded by his testimony, but such person so cross-examined shall become thereby a fully competent witness for the other party as to all relevant matters whether or not these matters were touched upon in his cross-examination . . .

Under this statute, appellant Brownstein's testimony concerning monitoring of the administration of Pitocin would be binding upon appellee unless contradicted by other testimony. The applicable rule was summarized in *Piwoz v. Iannocone*, 406 Pa. 588, 594–95, 178 A.2d 707, 710 (1962):

It is well established that where a litigant calls his adversary as for cross-examination pursuant to [28 P. S. § 381], that the testimony thus obtained is conclusively taken to be true *if it is not rebutted by other evidence* [citation omitted]. It may always be contradicted by other testimony and if this is accomplished all of the testimony and the truth thereof is for the jury's consideration . . . Again, this general rule that a party calling his opponent as for cross-examination is concluded by this testimony is subject to the exceptions that there may be such a degree of improbability in the statements themselves as to deprive them of credit, or that the circumstances themselves may constitute sufficient contradiction [citations omitted]. In short, it is not necessary that the contradiction be in the form of direct testimony [citations omitted].

(Emphasis in original)

Unlike appellant Brownstein, Dr. Shuster was neither a party defendant nor affiliated with appellant hospital at the time of trial. Consequently, Dr. Shuster testified

as a witness for appellee without restriction. In support
of the proposition that his testimony was therefore bind-
ing upon appellee, appellants cite *Lott v. Peoples Natural
Gas Co.*, 324 Pa. 517, 188 A. 582 (1936).

*Lott*, however, involved the doctrine of incontro-
vertible facts, and the doctrine that one is bound by one's
own witnesses was long ago repudiated. The correct
rule was stated by Mr. Justice MERCUR in *Pennsylvan-
ia R.R. Co. v. Fortney*, 90 Pa. 323, 328 (1879), and was
repeated in *Duffy v. National Janitorial Services, Inc.*,
429 Pa. 334, 336 n. 2, 240 A.2d 527, 528 n. 2 (1968):

> It is true, as a general rule, a party cannot be per-
> mitted to impeach the veracity of his own witness, yet
> he may disprove the facts to which his witness has tes-
> tified.

*See also* 3A *J. Wigmore, Evidence* § 907 (Chadbourn rev.
1970). Indeed, recent cases have articulated the even
more expansive rule that a party may impeach the credi-
bility of his own witness. *See, e. g., Commonwealth v.
Hill*, 237 Pa.Super. 543, 553, 353 A.2d 870, 877 (1975),
*quoting Commonwealth v. Gomino*, 200 Pa.Super. 160,
173, 188 A.2d 784, 791, *cert. denied*, 375 U.S. 865, 84 S.
Ct. 136, 11 L.Ed.2d 92 (1963) (collecting cases); *see also*
F.R. Evid. 607 ("[t]he credibility of a witness may be
attacked by any party, including the party calling him").
The old rule that a party vouched for the credibility of a
witness called by him has historical roots that are anach-
ronistic in light of the realities of contemporary litiga-
tion. 3A *J. Wigmore, Evidence* § 896, at 658–659 (Chad-
bourn rev. 1970); *McCormick on Evidence* § 38 (2d ed.
1972). As the late Judge GOODRICH observed in *John-
son v. Baltimore & O. R.R.*, 208 F.2d 633, 635 (3d Cir.
1953), *cert. denied*, 347 U.S. 943, 74 S.Ct. 639, 98 L.Ed.
1091 (1954),

> [b]ut when witnesses are called, in some stranger's
> lawsuit, to tell about things they saw, heard, or did,
> there is no reason in logic or common sense or fairness

why the party who calls them should have to vouch for everything they say.

## B

Since appellee was not bound by the testimony either of appellant Brownstein or of Dr. Shuster in that she could contradict it, the question is whether she did contradict it by presenting sufficient evidence of the failure to monitor the administration of Pitocin.

Appellants contend, and the dissenting opinion agrees, that the hospital records constituted "negative evidence" that could not overcome the "positive evidence" provided by the testimony of appellant Brownstein and Dr. Shuster. This asserted principle of law finds its origins in railroad accident cases involving testimony that a railroad bell or whistle was not heard. Illustrative is *Grimes v. Pennsylvania Ry. Co.*, 289 Pa. 320, 324, 137 A. 451, 452 (1927):

> The legal rule stated has been frequently recognized and applied in this State, and it has been uniformly held that where the evidence to establish lack of proper care is negative only, it is overcome by the positive evidence to the contrary, though the latter comes from the mouths of defendant's witnesses, and, under such circumstances, the question is not one for the jury to pass upon, where the physical facts corroborate their testimony . . . [T]he negative testimony, being controverted, does not amount to more than a scintilla, and therefore cannot prevail to establish an essential fact.

The cases enunciating this principle, however, are no longer good law. It is now recognized that their reasoning depended on form, not substance. Thus, in *Costack v. Penna. Ry. Co.*, 376 Pa. 341, 348, 102 A.2d 127, 131 (1954), the Supreme Court, speaking through Mr. Chief Justice STERN, said: "The question is not one merely of

form of expression—whether, for example, the witness says that 'no warning was given' as distinguished from his saying that 'he heard no warning' [citation omitted]. Rather it is whether he had acuteness of hearing, sufficient opportunity for hearing, and occasion for listening, and whether all the other circumstances tended to show that if a warning signal had been given he would probably have heard it, and therefore, not having heard it, he could fairly assert that no warning was given." In *Feerruzza v. Pittsburgh*, 394 Pa. 70, 77, 145 A.2d 706, 709 (1958), the Supreme Court stated that "[t]he earlier cases . . . [were] subsequently modified (expressly or by implication) and the statement that he did not hear a bell rung or that it was not rung was interpreted to have the same meaning and amount to positive testimony —positive in character and substance—if the witness was in a position to hear and was *consciously* listening for a sound or warning." (Citations omitted; emphasis in original.) Finally, in *Fallon v. Penn. Cent. Transp. Co.*, 444 Pa. 148, 155, 279 A.2d 164, 168 (1971), the Supreme Court, citing and quoting from *Costack* and *Ferruzza*, held that "a witness does not have to *say* that he was listening for his testimony to be considered positive evidence. Although Fallon had his radio on and window open only a quarter of an inch, we think that the jury could properly infer that he was consciously listening from the fact that he had 'occasion for listening'—he was approaching a railroad crossing." Thus, if not before, at least with *Fallon*, the positive *versus* negative evidence issue was laid to rest.

Here, as the trial judge points out in his opinion, "there was evidence of an official hospital policy mandating patient chart entries." (Opinion of Lower Court at Record 1396a). Specifically, the Assistant General Director and Administrator of the hospital testified that "[p]atients' charts must provide information which justifies the diagnosis, treatment and end results." The administrator also read from a paper prescribing the duties

of the resident physicians on obstetrics. This stated that "[a]ttending obstetricians must be present throughout this entire procedure due to the danger of excessive uterine contractions with resultant fetal distress or threatened uterine rupture." When this evidence is taken with the evidence that there were no entries on the chart, the jury had ample basis for inferring that there had been no monitoring. Similarly, appellee's expert, Dr. Weinberg, in formulating and testifying as to his opinion, could assume no monitoring.

## II

Appellants also contend that the trial judge erred in not striking the expert opinion testified to by Dr. Weinberg. Specifically, they contend that Dr. Weinberg's opinion was incompetent because of his refusal to assume the truth of the testimony of appellant Brownstein and Dr. Shuster concerning the monitoring of the administration of Pitocin. Appellants reason that since Dr. Weinberg repeatedly said he did not believe the testimony that there had been monitoring, his opinion was without proper foundation, and that since the trial judge's charge was insufficient to cure this defect, a new trial must be awarded.

It is true that a hypothetical question should contain all the "significant facts which should be taken into consideration, having regard to the real issue." *McGarity v. New York Life Ins. Co.*, 359 Pa. 308, 313, 59 A.2d 47, 49 (1948). Dr. Weinberg's task, however, was complicated by the conflicting evidence concerning the monitoring of the administration of Pitocin. The issue that this case presents, therefore, is, What is the expert to do if one fact set forth in the hypothetical (that there was no monitoring) is contradicted by another fact (that there was monitoring)? The trial judge so thoroughly re-

solved this issue that it is necessary only to quote from
his opinion:

Defendants next argue that the testimony of Dr.
Weinberg should have been stricken from the record
because the Doctor had declined to accept some of the
evidence included in the hypothetical question posed to
him by plaintiff's counsel. In particular, defendants
contend that the jury should not have considered Dr.
Weinberg's opinion because he admitted that in first
answering the hypothetical he had chosen to disregard
the testimony of Drs. Brownstein and Shuster that
they had continuously mointored the patient. (N.T.
804) We find no cause for complaint here, for on
cross-examination Dr. Weinberg also testified as to
what his opinion would have been assuming that Drs.
Brownstein and Shuster had been telling the truth.
Under this changed set of hypothetical facts, he testi-
fied that there would have been compliance with rea-
sonable medical standards. (N.T. 792) Our appellate
courts have long recognized that the opinion of an ex-
pert need not, cannot, be based upon all the evidence in
the case where there exists conflicting testimony be-
tween the parties. It is sufficient that an opinion be
premised on only part of the evidence, provided, of
course, that the particular facts assumed be made
known to the jury. *Battistone v. Benedette,* 385 Pa.
163, 169–70 [, 122 A.2d 536] (1956) ; *Gillman v. Me-
dia,* 224 Pa. 267, 274 [, 73 A. 342] (1909).

Defendants attempt to make an issue of the fact
that the hypothetical question posed by plaintiff's
counsel contained contradictory statements regarding
the presence of Drs. Brownstein and Shuster. It is, of
course, well established that a hypothetical question
should contain all material facts. *Murray v. Siegal,*
413 Pa. 23, 30 [, 195 A.2d 790] (1963). It is also the
law that where an issue is in dispute, counsel pro-
pounding the hypothetical may include the disputed

fact in the question as testified to by his witnesses. *Battistone v. Benedette, supra;* Pennsylvania Trial Guide § 7.79 (Feldman Revision). In this case, contradictory evidence had been presented by plaintiff's own evidence, i. e., the testimony of Dr. Brownstein and Dr. Shuster vs. the inferences arising from the labor room record. Therefore, in keeping with the applicable rule, plaintiff's counsel was obliged to include references to both sides of this question in the hypothetical. Indeed, it was defendant's position at the time of trial that the hypothetical had to refer to the doctors' testimony, thereby making unavoidable the ensuing contradiction in the question (N.T. 583). The practical difficulty created by this situation was resolved on cross-examination during which Dr. Weinberg made clear that his opinion would vary depending on which conflicting piece of evidence was relied upon. It was, of course, up to the jury which side should be accepted. Dr. Weinberg's testimony in no way removed that function from them; he expressed opinions assuming both sides of the factual dispute, and the basis for his alternative opinions were made known to the jury for their consideration. Opinion of Lower Court, at Record 1403a–1404a.

It is also true that it is not the role of an expert witness selectively to determine the facts upon which his opinion will rest; the opinion must rather be "based upon personal examination, or upon the assumed truth of the testimony of other witnesses adduced in court, or upon a combination of these two sources." *Hussey v. May Department Stores, Inc.,* 238 Pa.Super. 431, 357 A. 2d 635 (1976). *See also Yardley v. Cuthbertson,* 108 Pa. 395, 450–451 (1885). The trial judge, however, was fully aware of these propositions, and, as he states in his opinion, "went to great lengths to insure that the jury would not be bound by the factual determinations of Dr. Weinberg or any other witnesses." (Opinion of Lower Court, at Record 1404a).

The issue was really very simple, and the jury certainly understood it. The trial had been long and hard. On appellee's side was evidence that the medicine used might cause "excessive uterine contractions with resultant fetal distress or threatened uterine rupture" (Record 1395a); that because of this danger the "[a]ttending obstetrician must be present throughout the entire procedure" (*id.*); but that according to the hospital records, the obstetrician had not been present. On appellants' side was evidence that the doctor had been present. Obviously, the case was going to turn upon whether the jury accepted the testimony that the doctor had been present, or whether it found that this testimony was from an interested witness and was overcome by the documentary evidence that if the doctor had been present, that fact would have been noted, not temporarily on a blackboard but in the hospital records.

No doubt it would have been better for Dr. Weinberg not to have said that he himself disbelieved the interested witness and was persuaded by the documentary evidence. However, to some extent, at least, he could hardly say otherwise, lest his opinion be unintelligible. The trial judge summarized this neatly: "it is his position that he did not see the blackboard, he does see the chart, and based on the chart, he has the opinions which he has given you" (Record 1300a).

█ Concededly, during the testimony, and before the charge, the jury might have been impressed by Dr. Weinberg's appraisal, that is, it might have said to itself, "Well, if this expert believes the hospital record over the witness, so will we." The charge, however, removed this danger. As the dissenting opinion itself observes, the charge instructed the jury that

A doctor, even though a specialist or an expert, does not determine questions of credibility or believability. He must accept as true the information which is given to him in the hypothetical question.

Any questions of credibility, who you believe are for you and not for the Court and not for the attorneys and *certainly not for a doctor.*

We have added the emphasis in this passage because the phrase emphasized seems most significant, and one that the jury could not have overlooked; nor do we see how the parts of the charge emphasized by the dissenting opinion in any way diminish the force of this phrase.

In addition, it is, in our view, noteworthy that the judge's charge put the expert testimony in proper perspective:

Experts of this type, as I have indicated, are not witnesses to an occurrence, but, because of their special training, they are entitled to express an opinion.

You weigh the opinion and accept it or disregard it. An opinion is only an opinion, it creates no fact. Because of this, opinion evidence is considered of a low grade.

While expert testimony based upon theory must be considered of low grade and should be afforded little weight against positive testimony of actual facts, this does not mean it must be disregarded.

As I said, both Dr. Weinberg and Dr. Lewis are in this expert category, they are brought in here to give expert testimony. You give that testimony the consideration you believe it merits, *but bear in mind the difference between the testimony of a treating doctor and the testimony of an expert based upon a hypothetical question.* (Emphasis added) (Record 1302a).

Indeed, the language of the following part of the trial judge's comparison of the expert testimony of Dr. Weinberg with the testimony of appellant Brownstein and Dr. Shuster led to an objection by appellee's counsel:

Give some consideration to probabilities. Is it likely that this lady, in labor and receiving Pitocin, was ignored for four to five hours, as that is what it

amounts to? Is it likely that Dr. Brownstein was there at no time up until just about the time that she went to the delivery room around 8 o'clock? Of course, it could be, but it is well within your job of determining credibility. (Record 1306a).[3]

If any doubt remained in the jury's mind about how it was to appraise the testimony of Dr. Weinberg, surely it was removed by both of the foregoing parts of the charge (neither of which is cited by the dissenting opinion).

■ Ordinarily when we review a charge, the question is whether despite some confusing language, the charge was clear enough, or whether despite some error, the charge was when taken as a whole correct enough. In approaching such cases, the general rule to be applied is that no new trial will be ordered unless the confusion or the error were such as to have misled the jury to the prejudice of the losing party. *Keba v. Pickett*, 434 Pa. 148, 252 A.2d 675 (1969); *Miller v. Montgomery*, 397 Pa. 94, 152 A.2d 757 (1959); *Stack v. Tizer*, 204 Pa.Super. 203, 203 A.2d 403 (1964). Here, the charge was impeccable. It would be unwarranted and incongruous for us to hold that the jury was nevertheless not cautioned by the charge regarding its duties.

We have considered appellants' other contentions but are of the opinion that they are completely disposed of in the trial judge's opinion.

Affirmed.

VAN der VOORT, J., files a dissenting opinion in which WATKINS, President Judge, joins.

PRICE, J., notes his dissent.

VAN der VOORT, Judge, dissenting:

I must respectfully dissent.

3. After counsel for appellee objected (Record 1344a), the trial judge, in essentially the same language as that quoted, attempted to explain this portion of the charge to the jury (Record 1362a–1363a).

The instant appeal arises after a jury trial at which a general verdict for plaintiffs-appellees and damages of forty thousand ($40,000.00) dollars was awarded against all defendants-appellants, in a trespass action for medical malpractice. The action arose out of the August 16, 1962 maternity hospitalization of appellee Rita Stack. On the evening of that date, she entered the appellant Albert Einstein Medical Center for the delivery of her fourth child. During the course of her pregnancy and continuing through her hospitalization, Mrs. Stack was under the care of the three appellant physicians.

As presented by plaintiffs-appellees, Mrs. Stack's problems arose when she was given a labor-inducing drug, known as Pitocin, during the very early hours of August 17, 1962. Pitocin, according to experts who testified, is a drug commonly used in childbirth labor. Testimony demonstrated that while it offers significant medical benefits in the inducement and regulation of labor in the pregnant patient, it has well known possible dangerous side effects if not administered properly. It is administered intravenously and safe medical practice dictates that the flow of the drug and the condition of the patient be monitored constantly by attending medical personnel to assure immediate steps to curtail the development of the known possible side effects. It was the plaintiffs-appellees' contention and theory that proper monitoring did not take place and that such alleged shortcomings started a chain of events leading to severe medical problems for Mrs. Stack.

The actual difficulties which befell Mrs. Stack were not really in dispute, but only the causes of such problems. The record shows that after the delivery of her child at 8:30 A.M. on August 17, 1962, Mrs. Stack suffered intrauterine bleeding. A tear in her uterus was discovered, and after attempts to repair it failed, it became necessary to perform a complete hysterectomy. As a result of these unhappy events, Mrs. Stack required the transfusion of several pints of blood. Shortly following

her release from the initial hospitalization, Mrs. Stack was diagnosed as suffering from hepatitis and had to be re-hospitalized. Plaintiffs-appellees contended that medical negligence in the transfusion of blood at the time of the initial hospitalization caused the hepatitis. Finally, during the second hospitalization, Mrs. Stack received medication, which, it was alleged, caused her to suffer a hearing loss.

It is contended by appellant that the lower court should have granted Motions for Judgment Non Obstante Veredicto or a New Trial and I am constrained to agree that a new trial is necessary. I reach this conclusion as a result of my conclusion that improper testimony was introduced at trial and considered by the jury in its deliberations.

As noted in my resume of facts, above, it was the fundamental theory of appellees that medical malpractice occurred in the appellants' alleged failure to provide adequate monitoring during the administration of the drug Pitocin to Mrs. Stack. The record shows that the appellees relied primarily upon the hospital records for proof of such failures. During the time that Mrs. Stack was receiving Pitocin prior to the delivery of her child, the hospital chart, usually prepared contemporaneously with observations of the administration of a drug to a patient by medical personnel, showed an absence of entries for several hours during the critical period of care. The hospital chart was not the only evidence offered by the appellees, however, concerning the crucial element of monitoring. The appellees first called as witnesses two physicians who had attended Mrs. Stack during the night in question. The first witness was one of the defendants-appellants, Dr. Brownstein, while the second was Dr. Shuster, a physician who had been a resident on duty in the delivery area during the period of Mrs. Stack's labor and delivery. While Dr. Brownstein was called as on cross-examination, the former resident was not; both testified that Mrs. Stack's condition and the administra-

tion of Pitocin *were constantly monitored throughout the times relevant to this case* and further testified her progress was steadily noted on a blackboard in the delivery room.

In the face of this conflict between the witnesses' testimony as to monitoring, and the evidence to be inferred from the absence of notations in the hospital charts, appellees called another physician as an expert witness. This witness relied solely upon the medical record as evidence in testifying at great length to his conclusions that there had been a departure from accepted medical standards in the treatment, or lack thereof, rendered to Mrs. Stack. He also, with repetition, expressed the view that he could not base his opinion upon the testimony of the two attending physicians, despite the fact that it comprised a part of the hypothetical question upon which he was instructed to base his opinion, because he opined that he did not believe their testimony. Rather, he *ignored* their version and relied solely upon the lack of notations in the hospital record. He *finally stated, on cross-examination, that if he were forced to accept the testimony of the attending physicians as true, he would conclude that there had been no departure from accepted medical* practices.

The lower court, in its charge to the jury, concerning this expert's testimony said:

"He said if he assumes that Dr. Brownstein and Dr. Shuster did regularly monitor Mrs. Stack's condition and placed the information on the board, that would change his opinion, he would then state that the care and treatment was within acceptable treatment practice.

What he did here was weigh the evidence and decide which testimony he was going to accept as a basis for his opinion. He was in a position where, if he accepted the testimony of Dr. Brownstein and Dr. Shuster and, to a lesser extent, Dr. Arno, then this condition

occurred (sic) it may be one in a thousand, or something like that, but it did not result or was not causally related to a failure on the part of the doctors to closely monitor her condition.

He disregards that and bases his opinion on the hospital record, saying that the hospital record shows there was no adequate medical supervision of Mrs. Stack during her labor period.

A doctor, even though a specialist or an expert, does not determine questions of credibility or believability. He must accept as true the information which is given to him in the hypothetical question.

Any questions of credibility, who you believe, are for you and not for the Court and not for the attorneys and certainly not for a doctor. *Nevertheless, it is his position that he did not see the blackboard, he does see the chart, and based on the chart, he has the opinions which he has given to you.*

*What I am saying, finally, is that you examine his testimony the same as you examine the testimony of Dr. Brownstein or Dr. Shuster or anybody else in the case, and you decide what weight you are going to give to that testimony.*" (Emphasis added).

The appellants raised numerous objections to the above-described testimony of the appellees' expert and to the lower court's submission of this evidence to the jury. Objections were raised to the hypothetical questions asked. All pertinent allegations or error were preserved by inclusion in Motions for Judgment Non Obstante Veredicto and New Trial. Contrary to the lower court, and to my learned Brethren supporting the majority view on this appeal, I believe that several matters of error are clearly apparent, and mandate reversal.

Appellants contend that appellees were bound by the testimony of the attending physicians and should not have been permitted to place reliance on or hypothesize to an expert on the medical charts in this case. The first

physician called, Dr. Brownstein, was a defendant, and appellees were naturally permitted to treat him as an adverse witness and call him for cross-examination. However, the other physician, Dr. Shuster, who is no longer employed by the appellant hospital, nor in any way connected with the appellant physicians was properly held not to be an adverse witness when appellees requested this status for him at trial. Knowing that they would clearly be bound by the testimony of this witness, appellees elicited from him his recollection that close monitoring of Mrs. Stack had taken place throughout the crucial time period of her labor, and further that her progress had been contemporaneously charted on a blackboard. In my opinion, the law applicable in these circumstances. requires a holding that appellees were bound by the testimony of Dr. Shuster. See *Lott v. Peoples Natural Gas Co.*, 324 Pa. 516, 188 A. 537 (1936).

The majority Opinion extensively discusses my reliance upon *Lott, Id.* and my conclusion that in our Commonwealth a party is bound by the testimony of a witness he calls in litigation. While the majority makes several compelling philosophical arguments against that rule, and while I find it difficult to disagree with such arguments, I feel that the majority is incorrect in stating that the rule has been removed from our law. Although a rule of law may be termed anachronistic by our Court, we have no choice but to follow such rule when it is established in our law by the Supreme Court of Pennsylvania. While courts and commentators have often criticized the rule that one must vouch for the credibility of his own witnesses, our Supreme Court has stopped short of abrogating it. Only months ago, the majority of our Supreme Court stated:

"Courts have long recognized, however, that a strict application of the ancient voucher rule under the conditions of modern jurisprudence can lead to injustice, and so they have articulated and developed a number

of *exceptions to the rule*, usually *without questioning whether the rule itself* remains a *valid* one."

See *Commonwealth v. Gee*, 467 Pa. 123, 354 A.2d 875 (1976). In footnote 4 of the *Gee* case, the Supreme Court further criticizes the rule. However, as the Dissenting Opinion by Justice Roberts points out, the voucher rule is still viable in Pennsylvania, despite the nearly unanimous criticism to which it has been subjected. The initial sentence of Justice Robert's Dissenting Opinion in *Gee, supra,* reads:

"I believe that this case provides a good example (1) why we should abandon the ancient doctrine that the party producing a witness vouches for his truthfulness . . . ."

I will not seek to justify the rule—I do believe however that our Court is constrained to follow such clear and recent precedent.

I also note no exception to this rule present in the instant case permitting the appellees to avoid the onus of Dr. Shuster's testimony. Appellees did not claim surprise at the testimony when it was elicited. See *Gee, supra.* In light of these facts, I believe we are required by applicable precedent to hold that appellees are bound by the testimony of Dr. Shuster that monitoring was performed.

As discussed above, appellees offered a set of hospital charts which contained no notations of observations or treatment during several hours when observation or treatment was required. These records, in my view, constituted negative evidence, creating mere inferences which could not overcome Dr. Shuster's testimony which was positive direct evidence to the contrary.[1] See *Wil-*

1. While appellee presented evidence of a hospital policy requiring that its charts contain a reference to all observations and treatment, the lack of entries could not create more than an inference that observations and treatment did not occur. For this reason, the charts constituted negative evidence. While not to be condoned in any case, there is no evidence that the lack of a complete chart could be considered a proximate cause of the medical problems which befell Mrs. Stack.

*liams v. Pittsburgh*, 349 Pa. 430, 37 A.2d 540 (1944); *Grimes v. Pennsylvania Railroad Company*, 289 Pa. 320, 137 A. 451 (1927) ; *Rapp v. Central Railroad of Pennsylvania*, 269 Pa. 266, 112 A. 440 (1921).[2] In view of this inconsistency in the appellees' proof regarding monitoring, and the rule of law requiring that the positive testimonial proof be given greater weight, I believe it was error to allow the appellees to have their expert rely on a hypothesis of facts which included the negative proof encompassed in the hospital chart.

With regard to the expert's testimony and the trial court's handling of it, other error is apparent to me. As discussed above, the expert should not have been permitted to base any opinion on a hypothetical set of facts which included the negative evidence from the hospital chart. The record shows that the expert not only relied upon the chart, but continually refused to rely on the contrary evidence offered by the attending physicians. It is clear that an expert must rely upon all the facts set forth in the hypothetical question in rendering his opinion. *McGarrity v. New York Life*, 359 Pa. 308, 59 A.2d 47 (1948). Moreover, the expert in the instant case repetitively testified he could not rely on the version of facts offered by the physician witnesses because he speculated that they were not telling the truth. He offered the opinion that their testimony was not credible when measured against the absence of notations in the hospital chart. An expert witness may not base his opinion upon another opinion in this manner. *Collins v. Hand*, 431 Pa. 378, 246 A.2d 398 (1968). Further, I believe the trial court should have granted appellant's request and

2. While the majority contends that the negative evidence rule "was laid to rest", I must respectfully disagree. *Fallon v. Penn Central Transportation Company*, 444 Pa. 148, 279 A.2d 164 (1971), cited by the Majority to support its position, merely indicated certain types of *testimony* would be considered to be positive, rather than negative. I believe *Fallon* supports my view that the positive versus negative evidence principle is still viable in our law.

struck *all* such testimony by the expert. I do not believe the cautionary instruction in the court's charge, as quoted above, was sufficient—he should not have permitted the expert's testimony, based upon the negative evidence of the chart and the expert's own credibility assessment, to be considered by the jury.

Last, I note that appellants sought either a new trial or judgment non obstante veredicto. The appellees alleged that several distinct physical problems were suffered by Mrs. Stack, including a ruptured uterus (with subsequent hysterectomy), hepatitis, and a hearing loss. While the appellees' proof of causation relative to some of these problems was not strong, in reviewing it in light of a request for judgment non obstante veredicto, "[w]e must accept the whole body of evidence in the strongest way it can reasonably be interpreted in support of the verdict and reject any evidence to the contrary". *Geiger v. Schneyer*, 398 Pa. 69, 71, 157 A.2d 56, 57 (1969). In such a review, appellees' evidence would have to be considered sufficient, even without the expert's improper testimony, to overcome the appellants' request for judgment non obstante veredicto.

I would therefore grant a new trial.

WATKINS, P. J., joins in this dissenting opinion.