**Shirley DIETZEL, Appellant,**

v.

**Andrew GURMAN, M.D., Blair Orthopedic Associates.**

Superior Court of Pennsylvania.

Argued May 14, 2002.
Filed Sept. 10, 2002.

Curtis R. Quay, W. Conshochocken, for appellant.

M. David Halpern, Altoona, for Gurman, appellee.

Before: FORD ELLIOTT, LALLY–GREEN, and HESTER, JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 In this appeal, we are asked to decide whether the trial court erred when it refused to remove a compulsory nonsuit entered at the close of appellant Shirley Dietzel's ("patient's") case-in-chief. For the reasons that follow, we affirm. The factual and procedural history of the case follows.

¶ 2 On January 28, 1997, appellee Andrew Gurman, M.D. ("physician") performed hip replacement surgery on patient during which she suffered an injury to her sciatic nerve. Physician conceded that the injury occurred during the surgery, and also acknowledged that he did not "visualize" the sciatic nerve prior to performing the hip reconstruction.[1] (Notes of testimony, 11/13/01 at 57–58, 60.) Nevertheless, he testified that patient's injury was an inexplicable complication that occasionally arises during hip replacement surgery. (*Id.* at 58–60.)

¶ 3 In contrast, patient's expert, Philip Perkins, M.D. who was called as an expert in orthopedic surgery, testified to a reasonable degree of medical certainty that physician fell below the standard of care for total hip reconstruction using the "posterior approach," as physician did, when he failed adequately to visualize the sciatic nerve and to keep it in view during the surgery. (Notes of testimony, 11/14/01 at 14–17.)[2] Dr. Perkins also testified that

patient suffered "very severe damage indeed to both divisions of the sciatic nerve." (*Id.* at 18.) Additionally, Dr. Perkins opined to a reasonable degree of medical certainty that the cause of the significant injury to patient's sciatic nerve was physician's failure to visualize the sciatic nerve in order to protect it during the surgery, thereby dividing the nerve.

¶ 4 Dr. Perkins based his opinion as to the standard of care in large part on a learned treatise, the seventh edition of Campbell's Operative Orthopaedics, which he described as the Bible of all orthopedic surgeons. (*Id.* at 15, 42.) In fact, however, two additional editions had subsequently been published, one prior to patient's surgery and one later. The eighth edition, published in 1992, indicates that once a surgeon becomes familiar with the posterior approach, it is no longer necessary to expose the sciatic nerve except in rare circumstances. (*Id.* at 47–48.) The ninth edition, published in 1998, after patient's surgery but before Dr. Perkins wrote his report, indicates there is no need to expose the sciatic nerve unless the hip is distorted, a condition Dr. Perkins stated did not apply to patient. (*Id.* at 45–46.)

¶ 5 Furthermore, while Dr. Perkins had not himself examined patient, he based his conclusion that patient suffered very severe damage to the sciatic nerve on the report of S. Ross Noble, M.D., who is board certified in rehabilitation, electro-diagnostic medicine, and spinal cord injury medicine, and whose videotaped deposition had been played for the jury the previous

---

1. The sciatic nerve can be visualized in several different ways: it can be palpated or "felt"; it can be exposed by cutting away the tissue or fat covering the nerve and moving the tissue out of the way; or the covering tissue can be "retracted" or pulled out of the way with the fingers or a retractor to gain access to the nerve. (Notes of testimony, 11/14/01 at 34–35.)

2. The original record contains two volumes of testimony, both dated November 13, 2001. At the end of the first volume, however, the transcriptionist indicates, "END OF TESTIMONY TAKEN NOVEMBER 13, 2001." (Notes of testimony, 11/13/01 at 75.) To prevent confusion, we will therefore refer to the second volume as the November 14, 2001 volume.

day. (Dr. Noble's videotaped deposition testimony ("Noble deposition"), 10/25/01 at 8.) Dr. Noble had examined patient on October 6, 2000, at which time he performed EMG nerve conduction studies on patient. These studies indicated diminished response in both divisions of the sciatic nerve. (*Id.* at 36.) Dr. Noble opined that "from a functional standpoint, the muscles show[ed] permanent damage to the nerve ..." three years post-surgery. (*Id.*)

¶ 6 In addition to examining patient himself, Dr. Noble had examined the records of Vincent F. Morgan, M.D., who performed nerve conduction studies on patient on February 24, 1997 and October 13, 1997. According to Dr. Noble, the February 24th studies indicated extensive nerve damage to both the peroneal and tibial divisions of the sciatic nerve, paralysis of the muscles in patient's left foot, and weakness of the muscles higher than the foot. (*Id.* at 28–30.) The October 13th studies, conducted approximately eight and one-half months post-surgery, indicated damage to 94% of the axons in the peroneal nerve fibers and 86% of the axons in the tibial nerve fibers.

¶ 7 Based upon Dr. Morgan's studies, conducted within a year of surgery, and his own studies, conducted more than three years post-surgery, Dr. Noble opined to a reasonable degree of medical certainty that patient suffered an injury to her sciatic nerve during surgery *"initially resulting in paralysis* of the muscles that receive their nerve supply from the sciatic nerve and, now, resulting in permanent partial dysfunction of the tibial and peroneal nerves, which supply movement to the muscles ... of the left foot—and sensation to the foot and lower leg." (Noble deposition, 10/25/01 at 36–37 (emphasis added).) Dr. Noble also opined that the prognosis for further recovery was poor; that patient would always require a brace for her left ankle and would require the use of a

cane; and that patient would not regain any additional function in her foot or her nerves. (*Id.* at 37.)

¶ 8 As noted *supra,* patient's expert, Dr. Perkins, based his opinions as to the nature, severity, and cause of the damage to patient's sciatic nerve on his own expertise in the field of hip reconstruction surgery together with the reports of Drs. Noble and Morgan. According to Dr. Perkins, patient suffered a division of the nerve, an injury that can result either from cutting or from stretching to the point of being divided. (Notes of testimony, 11/14/01 at 18.) Dr. Perkins testified that this type of damage is "what we call a[n] axonotmesis, which is effectively a division of the nerve." (*Id.*)

¶ 9 On cross-examination, physician's counsel, who had retained Paul A. Liefeld, M.D. as an expert, asked Dr. Perkins to review Dr. Liefeld's report, dated March 30, 2001. Following a recess during which Dr. Perkins reviewed Dr. Liefeld's report, which he had not previously seen, Dr. Perkins read into the record Dr. Liefeld's conclusion that patient had had a substantial recovery of her motor function, having regained 60 to 80% of normal strength in her leg and having a protected sensation in all parts of her leg, an indication that the damage to the nerve had substantially recovered. (Notes of testimony, 11/14/01 at 64–70.) After reading Dr. Liefeld's report, Dr. Perkins testified that if Dr. Liefeld were correct, he would retract his statement that the injury to patient's sciatic nerve could only have been caused by severing or partially severing the nerve. (*Id.* at 70.)

¶ 10 Based upon the discrepancy between Dr. Noble's report and Dr. Liefeld's report, Dr. Perkins testified on re-direct that he was no longer comfortable saying that the sciatic nerve had been divided during surgery. (*Id.* at 74.) Instead, he stated:

There are three grades of nerve injury, neurapraxia is the mild one, neurotmesis is the middle grade, axonotmesis is when the actual fibers are severed. And I believe that this was likely a neurotmesis, the second grade. And I do not think that the nerve was divided at all because she has got motor sensory function in all divisions of that nerve in all muscles affected. It is not normal power by any means and it is not normal sensation, but I believe that the nerve is in continuity.

*Id.* at 74–75.

¶ 11 Patient's counsel then asked Dr. Perkins, "So what you're saying then is that if the jury would believe Dr. Noble's testimony ... as opposed to what Dr. Liefel[d] would be, that she has a paralyzed foot, then in your opinion would remain [sic] that the nerve was divided." (*Id.* at 75.) Dr. Perkins answered yes, after which patient's counsel continued, "However, if they follow Dr. Liefel[d]'s opinion concerning her functioning, then you would retract that opinion." (*Id.* at 75–76.) Again, Dr. Perkins responded, "Yes, I would." (*Id.* at 76.) As set forth *supra,* however neither Dr. Noble's October 6, 2000 report nor his October 25, 2001 deposition indicated that patient's left foot remained paralyzed. Instead, the later examination revealed diminished response and permanent damage, but not paralysis. (Noble deposition, 10/25/01 at 36–37.)

¶ 12 On re-cross, physician's counsel reviewed Dr. Morgan's October 13, 1997 office notes with Dr. Perkins, in which Dr. Morgan stated that patient showed a "substantial recovery" at that time, and also noted that patient could perform movements she would not be able to perform if she were still totally paralyzed. (*Id.* at 77–78.) Based on Dr. Morgan's note, Dr. Perkins opined that patient's sciatic nerve could not have been completely severed during surgery. (*Id.* at 78.)

¶ 13 At the close of patient's case-in-chief, patient's counsel moved into evidence the various reports and depositions on which Dr. Perkins had relied, after which patient rested her case. (*Id.* at 81–87.) Physician's counsel then requested, "[p]rior to a motion" to move into evidence physician's exhibits 1 through 5, which included Dr. Liefeld's report. (*Id.* at 87–88.) When the court asked plaintiff's counsel if he had any objection, counsel responded, "I have no objections as long as they are not going to a part of any motion. But being admitted in my case, I object to that." (*Id.* at 88.) The court then admitted the defense exhibits over plaintiff's counsel's objection. (*Id.*)

¶ 14 Immediately, defense counsel moved for a compulsory nonsuit, claiming Dr. Perkins' retraction of his opinion that physician divided the sciatic nerve eliminated the causal link between any possible breach of the standard of care (negligence) and patient's injury (damages). (*Id.* at 89.) In response, patient's counsel argued that Dr. Perkins' testimony should go to the jury, because he testified that his opinion would be based on whether the jury chose to believe Dr. Noble or Dr. Liefeld. (*Id.* at 90–91.) The court then asked, "So [Dr. Perkins'] opinion to a degree of scientific certainty depends on credibility of another witness?" (*Id.* at 92.) After further argument, the trial court, convinced that an expert's testimony should not depend on which medical opinion the jury found credible, granted the motion for compulsory nonsuit. (Order of court, 11/14/01.)

¶ 15 Patient timely filed a motion to remove the nonsuit, which the trial court denied by order entered November 26, 2001. This timely appeal followed, in which patient raises a single issue:

Did the trial court err in granting Appellees' motion for compulsory non-suit

because Appellant's expert, Dr. Perkins, stated his opinion would vary depending upon which conflicting piece of evidence would be believed by the jury, when the law specifically requires an expert to accept as true the information given to him in a hypothetical question and an expert cannot make credibility determinations for a jury?

Appellant's brief at 4.

¶ 16 Rule 230.1 of the Pennsylvania Rules of Civil Procedure governs motions for compulsory nonsuit:

### RULE 230.1 COMPULSORY NONSUIT AT TRIAL

(a)(1) In an action involving only one plaintiff and one defendant, the court, on oral motion of the defendant, may enter a nonsuit on any and all causes of action if, at the close of the plaintiff's case on liability, the plaintiff has failed to establish a right to relief.

> (2) The court in deciding the motion shall consider only evidence which was introduced by the plaintiff and any evidence favorable to the plaintiff introduced by the defendant prior to the close of the plaintiff's case.

Pa.R.Civ.P. 230.1, 42 Pa.C.S.A., adopted May 30, 2001, effective July 1, 2001.

 ¶ 17 The purpose of a motion for compulsory nonsuit is to allow the defendant to test the sufficiency of the plaintiff's evidence. *Deiley v. Queen City Business*

*Center Associates,* 757 A.2d 956, 957 (Pa.Super.2000) (citation omitted). "An order denying a motion to remove a compulsory nonsuit will be reversed on appeal only for an abuse of discretion or error of law." *Alfonsi v. Huntington Hospital, Inc.,* 798 A.2d 216, 221 (Pa.Super.2002) (*en banc*) (citation omitted). "A trial court's entry of compulsory nonsuit is proper where the plaintiff has not introduced sufficient evidence to establish the necessary elements to maintain a cause of action, and it is the duty of the trial court to make a determination prior to submission of the case to a jury." *Id.*

> In the context of actions for medical malpractice, the plaintiff must establish that (1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of the duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm.

*Corrado v. Thomas Jefferson University Hospital,* 790 A.2d 1022, 1030 (Pa.Super.2001). In determining whether to grant a compulsory nonsuit, the trial court must give the plaintiff "the benefit of every fact and all reasonable inferences arising from the evidence and all conflicts in evidence must be resolved in plaintiff's favor." *Alfonsi,* 798 A.2d at 218 (citation omitted).[3]

**3.** Our supreme court recently held that a trial court may not grant a nonsuit "where the defendant has offered evidence during or after the plaintiff's case, ... and that a reviewing court may not consider harmless error in affirming or reversing the nonsuit." *Harnish v. School Dist. Of Philadelphia,* 557 Pa. 160, 163–164, 732 A.2d 596, 599 (1999). The new Rule, cited *supra,* allows a nonsuit where the defendant has only introduced evidence *favorable* to plaintiff during plaintiff's case-in-chief, and therefore slightly modifies the rule announced in *Harnish.* Pa.R.Civ.P. 230.1, Note (emphasis added).

In this case, it is clear from the testimony set forth *supra* that physician offered evidence in the form of Dr. Liefeld's report during patient's case that was not favorable to patient. Nevertheless, patient has waived a challenge to the trial court's entry of a nonsuit on this basis by failing to raise it during argument on the motion for compulsory nonsuit, in her motion to remove the nonsuit, or on appeal. We recognize that patient's counsel did object to the introduction of physician's unfavorable exhibits during his case, especially if the exhibits were to be used as part of a motion, which they were. (Notes of

¶ 18 Even giving the plaintiff "the benefit of every fact and all reasonable inferences arising from the evidence," and resolving all conflicts in the evidence in favor of the plaintiff, *id.*, we must agree with the trial court that patient failed to establish the elements of a claim for medical malpractice, as set forth *supra*, during her case-in-chief.

¶ 19 Clearly, physician owed a duty to patient as her surgeon during a hip reconstruction. Nevertheless, despite Dr. Perkins' testimony that physician breached that duty when he failed to expose the sciatic nerve before proceeding with the posterior approach hip reconstruction, Dr. Perkins' opinion was completely discredited on cross-examination, as set forth *supra*. As to the cause of patient's injury, defense counsel even more seriously discredited Dr. Perkins' testimony that the sciatic nerve had been divided, the only opinion Dr. Perkins proffered in his expert report. (Expert report of P.G. Perkins, M.D., 9/21/00 at 2.) Dr. Perkins could not, therefore, change his testimony mid-trial, relying upon reports that should have been made available to him prior to trial.

¶ 20 We agree with physician that patient's reliance on *Stack v. Wapner*, 244 Pa.Super. 278, 368 A.2d 292 (1976), is therefore totally misplaced. That case involved a conflict in the evidence, which the expert could not have resolved. The question was whether physicians attending Mrs. Stack breached the standard of care by failing to monitor administration of a drug during her labor. The physicians testified that they had; however, Mrs. Stack's hospital chart contained no entries

indicating the physicians' presence, and hospital policy mandated chart entries. Judge Spaeth therefore neatly summarized the issue as follows: "What is the expert to do if one fact set forth in the hypothetical (that there was no monitoring) is contradicted by another fact (that there was monitoring)?" *Id.* at 297. The expert therefore testified that his opinion would vary depending on which conflicting piece of evidence the jury chose to believe. *Id.* at 298.

¶ 21 In this case, in contrast, the evidence does not conflict: Drs. Morgan, Noble, and Liefeld all reported a significant improvement in the functioning of the muscles in patient's left foot and ankle as well as in the nerve response in her left extremity. These improvements, according to Dr. Perkins' own testimony, indicated that the nerve could not have been divided, the only theory of causation Dr. Perkins presented in his report. As Dr. Perkins acknowledged, one to two percent of total hip replacements result in sciatic nerve palsy; the condition occurs more often in women than in men; fifteen percent of the cases of sciatic nerve palsy do not resolve and become permanent; and in 57 percent of the cases, the physicians studying the palsies cannot determine their source. (Notes of testimony, 11/14/01 at 58–59.)

¶ 22 From the foregoing, it is clear that at the close of patient's case, she had failed sufficiently to establish either breach of the standard of care or causation. As a result, the trial court did not abuse its discretion or commit an error of law when

testimony, 11/14/01 at 88.). Nevertheless, at least four recent panels of this court, including an *en banc* panel, have found waiver of identical claims, even where they were properly raised on appeal, if they were not raised during argument against the motion for compulsory nonsuit or in the motion to remove the nonsuit. *See Alfonsi*, 798 A.2d at 221

(holding that appellant's failure to object to the grant of the nonsuit on the basis that appellees had introduced evidence during appellant's case resulted in a waiver of that claim, citing *Corrado*, 790 A.2d at 1034; *Kelly v. St. Mary Hospital*, 778 A.2d 1224, 1227–1228 (Pa.Super.2001); *Hong v. Pelagatti*, 765 A.2d 1117, 1122–1123 (Pa.Super.2001)).

it denied her motion to remove the non-suit.

¶ 23 Order affirmed.